William P. BAYNARD,
Defendant-Appellant,

v.

STATE of Delaware, Plaintiff-Appellee.

Supreme Court of Delaware.

Submitted: April 22, 1986.
Decided: Dec. 5, 1986.
Rehearing Denied Dec. 23, 1986.

Robert C. Wolhar, Jr. (argued) of Robert C. Wolhar & Associates, P.A., Georgetown, for defendant-appellant.

Gary A. Myers, Deputy Atty. Gen. (argued), Dept. of Justice, Wilmington, for plaintiff-appellee.

Before HORSEY, MOORE and WALSH, JJ.

HORSEY, Justice:

Defendant, William P. Baynard, seeks reversal of his conviction in a jury trial of Murder in the First Degree (11 *Del.C.* § 636(a)(1)), Burglary in the Second Degree (11 *Del.C.* § 825(1)), Theft of a Firearm (11 *Del.C.* § 1451), and Possession of a Deadly Weapon during the Commission of a Felony (11 *Del.C.* § 1447(a)) in the death of Joy Luzier. Defendant received a mandatory sentence of life imprisonment on the murder one conviction and an additional fifty-five years for the remaining charges. On appeal, defendant asserts multiple grounds for reversal. The issues raised involve: (1) the State's exercise of its peremptory challenges; (2) the voluntariness of the defendant's statements; (3) the admission of a certain portion of the defendant's tape-recorded statement into the record; (4) the Court's jury instruction on 11 *Del.C.* § 469;

and (5) the Court's refusal to hold an evidentiary hearing to receive new matter. We find no reversible error and, therefore, affirm.

\* \* \*

The evidence at trial may at the outset be summarized as follows: On May 14, 1984, defendant Baynard broke into the unoccupied residence of Robert and Joy Luzier. Once inside the house, Baynard discovered a water jug containing some coins, and in a kitchen drawer he found a revolver. As Baynard was collecting his spoils, Joy Luzier returned home for lunch to discover that her house had been burglarized. Luzier immediately called her father-in-law and asked him to come over. She then proceeded to walk down the hallway, where she confronted Baynard. With Luzier's back to the wall, Baynard took the revolver and shot Luzier twice, killing her. Baynard then fled the scene and threw the revolver into the woods behind the house.

Later that afternoon, after a motorist informed the state police that he had given Baynard a ride to an area near the Luzier house, the police went to Baynard's residence. As Baynard saw the police cars approach, he fled into the nearby woods. He was later captured and turned over to Detectives Hudson and Truitt.

At this time, Baynard told the detectives that while he had been outside the Luzier house, another man named "Baldy" had gone into the home, but he (defendant) had fled when he saw Luzier drive up. After alerting the other police units to begin looking for Baldy, the detectives proceeded to take Baynard to the Millsboro Police Station to tape-record his statement.

Later at the police station, Baynard admitted being in the victim's house with Baldy. Baynard stated that while Baldy was struggling with Luzier, he jumped out of a window and while in the woods he heard several shots. That evening, after a private conversation with his girlfriend, Baynard told the police that he had been in the house alone and had shot Luzier after she pulled a gun on him and struggled with him.

At trial, Baynard admitted both the burglary and the shooting of Luzier. In defense he argued (1) that the killing was justified as an act of self-defense, and (2) that he lacked the culpable state of mind sufficient for first degree murder. The jury rejected both of these defenses and found Baynard guilty on all charges.[1] Because the jury was unable to unanimously recommend the death penalty, the Superior Court sentenced Baynard to mandatory life imprisonment for murder one, plus an additional fifty-five years for the other charges.

I

The first issue presented is whether defendant was deprived of his State constitutional right under Del.Const., art. I, § 7, to trial by an impartial jury by the Trial Court's handling of the State's exercise of its peremptory challenges. Invoking *Riley v. State*, Del.Supr., 496 A.2d 997 (1985), *cert. denied*, — U.S. —, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986), defendant contends that the Court committed procedural error in failing to: (1) determine if defendant established a prima facie case of racial bias; (2) require the State to come forward with an explanation for its peremptory challenges of blacks; and (3) evaluate and determine whether the State's explanations were bona fide.

A.

Defendant raises the issue on the following record: Baynard, a black, was accused of murdering Joy Luzier, who was white. From a jury panel of two hundred fifty persons, twelve jurors and four alternates were drawn. Of the two hundred fifty potential jurors, thirty-six were black,

---

1. At trial, the State prosecuted defendant for intentional killing and felony murder involving a reckless killing during the commission of a felony. After the jury returned guilty verdicts on both counts, the State, on the Court's direction, was required to make an election for the sentencing phase. The State chose the intentional homicide count, 11 *Del.C.* § 636(a)(1).

one was oriental and the remainder were caucasian. The State exercised six of its twelve peremptory challenges,[2] including its first four, against black candidates.[3] The defendant objected each time the State exercised a peremptory challenge against a prospective black juror. The Court, however, ruled in favor of the State and struck each potential juror.

Specifically, the State exercised its first peremptory challenge against Joseph Watson, a black. The defendant immediately stated for the record that Watson was black and that the jury panel consisted of a very limited number of black prospective jurors.

The State exercised its second peremptory challenge against black venirewoman Daisey Stevenson. The defendant again stated for the record that the prospective juror was black and that he felt the State was engaging in a pattern of racial discrimination in the exercise of its peremptory challenges. The defendant then asked the Court not to allow the last challenge based upon the apparent racial discrimination since the only two peremptory challenges exercised by the State were against blacks. When the Court asked the State if it wished to respond, the prosecutor offered to explain the reasoning behind its challenges at the end of the jury selection. The State did not want to indicate what its reasons were at the present time because it did not want to disclose its theory of the case. The Court stated:

> Yes, you [the defendant] have made a record. I am not going to make a ruling as to whether or not the State is simply striking blacks. I agree with the defense that the two challenges they have used have both been against blacks. That is a fact that the Court cannot dispute, but I have seen no pattern as of yet that the State is simply striking all blacks. If it develops, I will then call upon the State to state its reasons if they have any, but at this point we have only been through eleven jurors and three of them have been black, two have been challenged by the State and one was excused by the Court because he was a correctional officer at Sussex Correctional Institute and that was Ronald Hall. I have seen no pattern as yet, but if one starts to develop I will certainly call upon the State to give its reasons.

The next prospective juror was William Hyland, also a black. The State exercised its third peremptory challenge against Hyland; and defendant renewed his prior objection. Although the Court did not explicitly determine if the defendant had established a prima facie case of racial discrimination, the State volunteered to explain its reasons for challenging the three prospective black jurors.

The State indicated that it struck Hyland because he had equivocated on imposing the death penalty. Similarly, Stevenson was challenged because her responses, particularly her reference to the killing as an "accident," made her appear unreceptive to the State's theory of murder and the imposition of the death penalty. With respect to Watson, the State explained that he was hard of hearing and appeared to be "stupid," which suggested he might have diffi-

---

**2.** Superior Court Criminal Rule 24 provides, in pertinent part, as follows:

> **(b) Peremptory Challenges.** In capital cases the State shall be entitled to 12 peremptory challenges and the defendant or defendants shall be entitled to a total of 20 peremptory challenges. In capital cases the right to challenge shall be exercised against each juror immediately upon conclusion of the examination of such juror and the defendant or defendants shall exercise or refuse to exercise the right to challenge before the State is called upon to do so.

However, because peremptory challenges are a creature of statute rather than of constitution, they are privileges which are subject to reasonable regulation as to the manner of their exercise. *See Hickman v. State,* Del.Supr., 431 A.2d 1249, 1250 (1981); *Shields v. State,* Del.Supr., 374 A.2d 816, 820, *cert. denied,* 434 U.S. 893, 98 S.Ct. 271, 54 L.Ed.2d 180 (1977).

**3.** The State exercised five of its remaining six peremptory challenges against whites and one against the only oriental on the jury panel.

culty understanding the evidence. After considering these explanations, the Court found that the first juror challenged, Watson, indeed had a hearing problem and that he had extreme difficulty understanding the Court's questions. As to the State's other two peremptory challenges, of Stevenson and Hyland, the Trial Judge ruled that the reasons given for the strikes were "reasons I cannot quarrel with at this point."

Twenty-one more prospective jurors were called and questioned without either side invoking a peremptory challenge. The State then lodged a challenge for cause against Chester West, a black. Cause was stated to be established because he had twice indicated that he would "automatically" vote for life imprisonment at a penalty hearing. The Court acknowledged that West displayed some confusion concerning his position on the death penalty, but refused to excuse him for cause. The State then proceeded to exercise its fourth peremptory challenge against West. When the defendant again renewed his racial discrimination claim, the Court held that the State's reason "would be acceptable, whether he was white or black."

Thereafter, the State exercised its fifth peremptory challenge against Jill Koyanagi, the only oriental on the panel, and its sixth peremptory challenge against Michael Steele, a white.

The State then exercised its seventh peremptory challenge against Cynthia Brinkley, a black. After Brinkley indicated that her brother had been convicted by one of the State prosecutors and then fired from his position as a state police officer, the State asked that she be excused for cause. When the Court refused, the State exercised its seventh peremptory challenge.[4]

The State exercised its next four peremptory challenges against whites and its twelfth peremptory challenge against Epluribus Mills, a black. Mills, however, revealed that she had a son who had been convicted of murder but who had successfully avoided the death penalty. The Court refused to remove Mills for cause and the State then used its final peremptory challenge. The defendant again established for the record that Mills was a black. The Court noted, however, that, "I think it is clear as to why she was struck."

When jury selection had been completed, the jury consisted of one black, eleven whites, and four white alternates. Defendant then moved the Court to quash the jury panel on the ground that the State had engaged in a systematic use of its peremptory challenges in a racially discriminatory manner. The Court, in a bench ruling, denied the request, stating, "As to the question of the State's striking of the jurors, they gave a reason for each juror that was stricken, and this Court cannot say, because of these reasons, that there was a systematic striking of blacks to prejudice the defendant."

**B.**

In *Riley*, 496 A.2d at 1012, this Court concluded that the use of peremptory challenges to exclude prospective jurors solely upon the basis of race violates a criminal defendant's rights under Del.Const. art. I, § 7 to a trial by an impartial jury.[5] Borrowing heavily from *People v. Wheeler*, Cal.Supr., 22 Cal.3d 258, 148 Cal.Rptr. 890, 583 P.2d 748 (1978), and *Commonwealth v. Soares*, Mass.Supr., 377 Mass. 461, 387 N.E.2d 499 (1979), *cert. denied*, 444 U.S. 881, 100 S.Ct. 170, 62 L.Ed.2d 110 (1979), we set out in general terms a procedure for trial courts to follow in the future when they are presented with a claim that per-

---

4. The only response the defendant made to the State's challenge of Brinkley was to note for the record that Brinkley was black. Defendant, however, did not assert that the prosecutor's reasons for dismissing Brinkley were based upon her race.

5. Article I, § 7 of the Delaware Constitution, the substantive equivalent of the Sixth Amendment, states in part: "In all criminal prosecutions, the accused hath a right to ... a speedy and public trial by an impartial jury...."

emptory challenges have been exercised on discriminatory grounds. 496 A.2d at 1012–13.[6] Therefore, the procedures established in *Riley* have only prospective, and not retroactive, application.[7] In the instant case, defendant's trial occurred nine months before we announced our decision in *Riley*. Thus, the *Riley* procedures were neither applicable to the Trial Court at the time of the defendant's trial nor applicable upon this appeal, since we have explicitly declined to give the *Riley* procedures retroactive application. *Id.*

■ However, even if *Riley* were applied to this case, we conclude that the Court's procedures were in substantial compliance with the underlying principles of *Riley's* three-tier test. *Id.* at 1013, *viz.*, (1) the presumption that the State is exercising its peremptory challenges for constitutionally permissible purposes, subject to a prima facie showing to the contrary; (2) a finding of substantial likelihood whether the State is exercising its challenges on the basis of race; and (3) if so found, whether the State has then met its burden of proving that the exercised challenges were not racially motivated.

### C.

It is undisputed that defendant sustained his threshold burden under *Riley* of making a prima facie showing of racial discrimination by objecting to the State's exercise of its peremptory challenges. *Cf. Saunders v. State,* Del.Supr., 401 A.2d 629, 632 (1979), *cert. denied,* 449 U.S. 845, 101 S.Ct. 128, 66 L.Ed.2d 54 (1980); *Johnson v. State,* Del.Supr., 312 A.2d 630, 631 (1973). Defendant noted the race of each black against whom the State exercised a peremptory challenge and put in evidence the juror's questionnaire form which indicates the race of each prospective juror. Similarly, defendant moved the Court to refuse the peremptory challenges against two of the drawn black jurors and moved to quash the entire panel at the end of the jury selection process.

Thus, if the Trial Court had prescience of *Riley* and been bound by it, defendant would have met the first tier of the *Riley* rule, but not the second and third. Defendant established a prima facie case that the State was exercising its peremptory challenges solely on the basis of race.[8] Strict procedural compliance, however, is not required where, as here, the Court was acting before the *Riley* procedures were announced.[9] Additionally, the *Riley* procedures are but "general terms" that we set out to fashion a "practical approach" for courts to determine whether peremptory challenges have been exercised on a racial-

---

**6.** A number of authorities persuaded us to adopt the impartial jury approach and not to apply the equal protection test established in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), when determining whether a party's exercise of its peremptory challenges violates its adversary's right to a fair and impartial trial. *See Riley,* 496 A.2d at 1012.

Subsequent to our decision in *Riley,* the Supreme Court rejected *Swain's* evidentiary burden. *See Batson v. Kentucky,* —— U.S. ——, ——, 106 S.Ct. 1712, 1721, 90 L.Ed.2d 69 (1986). In *Batson* the Court held "that a defendant may make a prima facie showing of purposeful racial discrimination in the selection of the venire by relying solely on the facts concerning its selection *in his case.*" *Id.* at ——, 106 S.Ct. at 1722 (emphasis in original).

However, because the Supreme Court was construing the equal protection clause of the Federal Constitution, we are not bound by the *Batson* holding. Thus, we will rely upon *Riley* to determine the defendant's rights under Article I, § 7 of the Delaware Constitution.

**7.** *Accord Wheeler,* 148 Cal.Rptr. at 907 n. 31, 583 P.2d at 766 n. 31; *Soares,* 387 N.E.2d at 518 n. 38. *See also Daniel v. Louisiana,* 420 U.S. 31, 95 S.Ct. 704, 42 L.Ed.2d 790 (1975) (decision of *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), is not to be applied retroactively).

**8.** For other factual circumstances in which a defendant has established a prima facie case of racial discrimination, *see McCray v. Abrams,* 2d Cir., 750 F.2d 1113 (1984); *Wheeler, supra; State v. Neil,* Fla.Supr., 457 So.2d 481 (1984); *Soares, supra.*

**9.** *Commonwealth v. Walker,* Mass.Supr., 379 Mass. 297, 397 N.E.2d 1105, 1108 (1979); *Commonwealth v. Clark,* Mass.Supr., 378 Mass. 392, 393 N.E.2d 296, 305 n. 5 (1979).

ly discriminatory basis. *Riley*, 496 A.2d at 1012–13. Thus, even in post-*Riley* trials, strict adherence with the *Riley* procedures is not mandated.[10] Therefore, the failure of a pre-*Riley* trial court to find that the defendant had sustained his burden of establishing a prima facie case of racial discrimination does not constitute reversible error.

## D.

The defendant's second contention—that the Court erred in not requiring the State to come forward with an explanation for the peremptory challenges of the prospective black jurors—is also not a ground for reversal. In the instant case it was unnecessary for the Court to require the State to come forth with a reasoned non-racial explanation because the State volunteered non-racial reasons for striking each of the first three potential black jurors. With regard to the State's remaining peremptory challenges to strike the three other prospective black jurors, the record clearly reflects the reason why each juror was challenged. Thus, even though the Court did not explicitly call upon the State to explain the reasons for its challenges, the State, in fact, met its burden of providing a non-racial explanation for challenging the prospective black jurors.

## E.

The defendant's final ground of error under the *Riley* procedures is that the Court failed to evaluate the State's explanations for challenging the prospective black jurors to determine that they were "bona fide" and not pretext. However, jurisdictions that have adopted the *Riley-Wheeler* approach uniformly defer to the trial judge by applying the clearly erroneous standard in reviewing findings involving motivations underlying peremptory challenges. *Wheeler*, 148 Cal.Rptr. at 905–06, 583 P.2d at 764–65; *Soares*, 387 N.E.2d

at 517. Because the trial court's findings will largely rest on the judge's personal observation of the *voir dire* proceedings and on the credibility of the parties, a reviewing court should give those findings great deference. *Batson*, —— U.S. at ——, n. 21, 106 S.Ct. at 1724 n. 21; *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). "Sorting out whether a permissible or impermissible reason underlies a peremptory challenge is the function of the trial judge, and [an appellate court should] not substitute [its] judgment for his if there is support for it in the record." *Commonwealth v. Thomas*, Mass.App., 19 Mass.App. 1, 471 N.E.2d 376, 379 (1984). We will "rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." *People v. Hall*, Cal.Supr., 35 Cal.3d 161, 197 Cal.Rptr. 71, 75, 672 P.2d 854, 858 (1983).

Here, the Court appraised the demeanor and credibility of both the potential jurors and the prosecutor and determined that the State's exercise of its peremptory challenges was nondiscriminatory. Furthermore, the Court had before it the prosecutor's reasons for challenging the prospective black jurors. On this record, we cannot say that the Trial Court's findings are clearly erroneous.

## II

Defendant's second ground for reversible error is the Trial Court's failure to suppress his confession that he shot the victim. Defendant argues that his confession was induced by police promises of leniency and by deception so coercive as to overcome his will to make a rational choice. Hence, defendant argues that his confession must be found to have been involuntary and thus inadmissible. We conclude under the totality of the circumstances that the police

---

10. Similarly, in *Batson* the Supreme Court declined to formulate *particular* procedures to be followed upon a defendant's timely objection to a prosecutor's challenges. —— U.S. at ——, 106 S.Ct. at 1724.

conduct was neither so coercive nor so deceptive as to render the defendant's statement inadmissible. *See State v. Rooks*, Del.Supr., 401 A.2d 943 (1979).

## A.

The facts relevant to the issue of voluntariness are not in dispute. State troopers arrested defendant, a thirty-year-old male with an eleventh grade education, at gun point in a woods at 5:45 p.m. on May 14, 1984. The troopers immediately turned defendant over to Detectives Hudson and Truitt.

The detectives placed defendant in their car and advised him of his *Miranda* rights.[11] Defendant, who had prior experience with the legal system, acknowledged that he understood the warnings.[12] As the detectives pulled off onto a dirt road to question defendant, they reassured him that no one was going to harm him and that they just wanted to know what happened. Defendant told the detectives that while he had been outside the victim's house, Baldy had gone inside the home, but defendant had fled when he saw the victim drive up. The detectives then proceeded to take defendant to the local police station in order to tape record his statement. It was then 6:20 p.m.

At the station, defendant signed a written form allowing the police to search the home that he shared with his girlfriend. After the detectives gave defendant his *Miranda* warnings for a second time, defendant gave a tape-recorded statement, in which he reiterated the factual scenario that he had told the detectives in the car.

After the tape recorder was turned off, Detective Hudson falsely told defendant that his fingerprints had been discovered on the water jug inside the victim's home. Hudson then reactivated the tape player and defendant admitted being inside the victim's home. Defendant then claimed he had run from the house after watching Baldy struggle with the victim.

At 7:30 p.m., the detectives and defendant left for the defendant's house in order to retrieve the shirt and shoes defendant had been wearing earlier that day. As they were en route to defendant's house, Detective Hudson, hypothesizing about defendant's second factual scenario which placed defendant inside the house, told defendant that if he had not carried the gun into the house but had killed Luzier after she had confronted him with the gun, the crime would be a lesser degree of murder or manslaughter with the possibility of parole. Detective Hudson, however, emphasized that he could not promise defendant (1) that he would be paroled; or (2) when he would be paroled. Defendant responded by telling the detectives, "I understand where you are coming from"; but he again repeated that Baldy had shot the victim.

At the defendant's home, the detectives and defendant's girlfriend were unable to locate the defendant's shirt. The defendant, who had remained seated in the police car, asked to speak to her. After telling her that "it would be easier on all of us if he tells the truth," the detectives allowed her to speak to defendant. Although she told defendant that it would be easier if "he would just tell the truth about what he did know," defendant repeated that he had not killed Luzier.

After defendant and his friend had talked alone for fifteen minutes, the defendant called Detective Hudson over to the car and told him to turn on the tape recorder. At approximately 8:30 p.m., some fifty minutes after Hudson had mentioned the alternatives to murder one, defendant stated that he had shot the victim after taking the gun from her during a struggle.

---

**11.** Defendant does not challenge the adequacy of the *Miranda* warnings or the validity of his waiver.

**12.** The police had arrested defendant within the past nine years on six prior occasions for various crimes, including burglary and robbery, and on each occasion advised defendant of his *Miranda* rights.

Thereafter, defendant took the detectives to the location where he had thrown the gun. After finding the gun and stopping for food, the detectives took defendant to State Police Troop 4. There, after being read his *Miranda* rights for a third time, defendant gave a detailed statement of how he shot the victim.[13] In this statement, the following exchange occurred:

HUDSON: Just for the record, I want you to explain in your own words how you have been treated since we picked you up.

BAYNARD: Like a gentleman. Nobody has threatened me or give me anything or nothing. I have been treated fair. You give me something to eat cause I was hungry—cigarettes cause I wanted to smoke.

HUDSON: Nobody has threatened you?

BAYNARD: Nobody has threatened me.

HUDSON: Did you give this statement of your own free will?

BAYNARD: Yes sir.

HUDSON: Is everything contained in this statement true?

BAYNARD: Yes.

At trial, defendant moved to suppress his statement that he had shot the victim. The Court, however, found the defendant's statement to be voluntary and, thus, admissible.

---

**13.** Defendant concluded this last statement at 11:38 p.m. Thus, the total elapsed time between defendant's initial arrest and his final statement was approximately six hours.

**14.** In *Rooks*, 401 A.2d at 943, this Court stated that, "[p]romises or inducements are material to the issue of reliability or trustworthiness, and do not make a statement involuntary, unless so extravagant, or so impressionable as to overbear the person's will and rational thinking process." *Id.* at 948. Similarly, a lie told to a defendant about an important aspect of the case may affect the voluntariness of a statement. *See Frazier v. Cupp*, 394 U.S. 731, 739, 89 S.Ct. 1420, 1423, 22 L.Ed.2d 684 (1969). The effect of a lie, like the effect of a promise, must be analyzed in the context of all the circumstances of the interrogation. *Frazier*, 394 U.S. at 737, 739, 89 S.Ct. at 1423, 1424.

**B.**

The question of voluntariness is a question of fact to be determined from the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *Rooks*, 401 A.2d at 948. Thus, the question in each case is whether the defendant's will was overborne when he confessed. *Schneckloth*, 412 U.S. at 225–26, 93 S.Ct. at 2046–47; *Lynumn v. Illinois*, 372 U.S. 528, 534, 83 S.Ct. 917, 920, 9 L.Ed.2d 922 (1963); *Rooks*, 401 A.2d at 947. A totality of the circumstances approach, however, requires the reviewing court to consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the defendant. *Rachlin v. United States*, 8th Cir., 723 F.2d 1373, 1377 (1983). Factors which bear on these circumstances include the following:

the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047 (citations omitted). *See also Rooks*, 401 A.2d at 948.[14]

---

It is also well settled that an involuntary confession may result from psychological, as well as physical, coercion. *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). However, police may use some psychological tactics in eliciting a statement from a suspect. *See Haynes v. Washington*, 373 U.S. 503, 514–15, 83 S.Ct. 1336, 1343–44, 10 L.Ed.2d 513 (1963). For example, the police may play on the defendant's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state. *Rachlin*, 723 F.2d at 1378; *United States v. Vera*, 11th Cir., 701 F.2d 1349, 1363–64 (1983). Police officers may initiate conversations on cooperation; they may promise to make a defendant's cooperation known to the prosecutor; and they may also make and breach certain promises without rendering a resulting confession invol-

■ Thus, the attention of the trial judge must be focused on the "totality of circumstances" overview of the behavior of the interrogators and the mental and physical make-up of the defendant. *Rooks*, 401 A.2d at 948. This must be done on a case-by-case basis,[15] to reach an ultimate determination on the *voir dire* record, as to whether the behavior of the interrogators was such as to overbear the will of the defendant to resist and bring about a statement not "the product of a rational intellect and a free will." *Id.* at 948–49.

### C.

■ In the instant case we conclude that there is sufficient evidence of record to support the Trial Court's finding of voluntariness.[16] Defendant was a thirty-year-old male at the time of arrest with an eleventh grade education and considerable experience with the legal system. (*See supra* note 12.) Thus, he was well aware of the consequences of confessing. *Miller v. Fenton*, 3d Cir., 796 F.2d 598, 606 (1986). Further, defendant was neither suffering from any physical ailment that would have impelled him to confess nor under the influence of any drugs. *Cf. Reck v. Pate, 367 U.S. 433, 81 S.Ct. 1541, 6 L.Ed.2d 948 (1961); Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). It is also clear that Detective Hudson made no threats and engaged in no physical coercion of the defendant.

In addition, defendant received *Miranda* warnings on three separate occasions during the six hours of intermittent interrogation and each time, he acknowledged that he understood his rights.[17] Moreover, the defendant never requested the presence of a lawyer to advise him. When defendant did ask to speak to his girlfriend, the detectives promptly granted his request. *Cf. Haynes v. Washington, supra; Ziang Sung Wan v. United States,* 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924). Therefore, this case is distinguishable from cases of lengthy interrogation during incommunicado detention.[18]

We do not find Detective Hudson's untruth—that defendant's fingerprints had been discovered on the water jug—to constitute sufficient trickery to overcome the defendant's will. *Miller,* 796 F.2d at 607. Although the lie could have caused the defendant to reflect on the believability of his earlier statement, it did not exert such pressure that defendant could not make a rational choice. Similarly, Detective Hudson's statement, that if Luzier had confronted defendant with the gun the crime may be less than first degree murder, was not sufficient to prevent defendant from making a rational choice of his own free will. The fact is that Hudson did not make any express promise either that defendant would be charged with the lesser crime or that he would be paroled.[19] Furthermore,

---

untary. *United States v. Shears,* 4th Cir., 762 F.2d 397, 401–02 (1985).

15. *See Stein v. New York,* 346 U.S. 156, 185, 73 S.Ct. 1077, 1093, 97 L.Ed. 1522 (1953) (noting that "[t]he limits [of permissible questioning tactics] in any case depend upon the weighing of the circumstances of pressure against the power of resistance of the person confessing. What would be overpowering to the weak of will or mind might be utterly ineffective against an experienced criminal.").

16. For similar holdings of this Court *see, e.g., Hopkins v. State,* Del.Supr., 501 A.2d 774, 777 (1985); *Anderson v. State,* Del.Supr., 452 A.2d 955, 957 (1982); *Fullman v. State,* Del.Supr., 389 A.2d 1292, 1297 (1978).

17. Cases in which courts have found psychological coercion have typically involved periods of

interrogation longer than six hours. *See Blackburn v. Alabama, supra* (nine hours); *Spano v. New York,* 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959) (two weeks); *Leyra v. Denno, supra* (four days); *Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949) (five days).

18. *See, e.g., Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); *Reck v. Pate, supra; Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958); *Fikes v. Alabama,* 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); *Ashcraft v. Tennessee,* 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).

19. *Cf. United States v. Powe,* D.C.Cir., 591 F.2d 833, 845 (1978) (detective promised to drop defendant's case if he turned in other drug dealers).

this statement had no effect upon the defendant because in response he repeated his earlier story that Baldy had shot the victim.

The defendant's actions at his house confirm the voluntariness of his statement. Defendant called Detective Hudson over to the police car and, on his own initiative, requested that his statement be tape recorded. Without any questioning from Hudson, defendant then admitted that he had shot Luzier. Thereafter, defendant physically helped the police search in the underbrush of the woods for the gun. Finally, in the last tape-recorded statement, defendant acknowledged that he had been treated like a gentleman and that his statement was given of his own free will.

Thus, viewing the totality of the circumstances, we must affirm the Trial Court's finding that defendant's statement was voluntary and, therefore, admissible.

### III

The defendant also raises three other grounds for reversal. Although we find no basis for reversible error in any of these issues, we will address each in turn.

### A.

Defendant contends that the Court abused its discretion in rejecting his request to delete the reference that he "smoked pot" from his last tape-recorded statement. At the end of the interrogation at the police barracks, Detective Hudson

asked, "We asked you on the other tape, but we want to get it on this tape too. Have you been drinking today?" Defendant responded, "No sir. I don't drink. Very seldom do I drink. I smoked pot Saturday. That's the last time I smoked pot."

The Court denied the defendant's request to excise this response from the statement and after the tape was played for the jury, defendant moved for a mistrial. Similarly, the Court denied the motion for mistrial holding that the reference was "so insignificant that it is not worthy of a mistrial." [20]

Defendant argues that the reference to his smoking pot was prejudicial evidence of irrelevant bad conduct that the Court admitted in violation of D.R.E. 402. [21] The State counters that the evidence was not offered to prove the defendant's character or criminal disposition, but was relevant to show (1) the voluntary nature of the statement; and (2) that defendant was not under the influence of drugs when he made the statement.

A decision whether to admit testimony as relevant is within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Lampkins v. State*, Del.Supr., 465 A.2d 785, 790 (1983); *Thompson v. State*, Del. Supr., 399 A.2d 194, 198–99 (1979). D.R.E. 404(b) prohibits the admission of evidence of other crimes or wrongful acts to show a person's character, unless such evidence is admissible for another purpose. [22] Thus, D.R.E. 404, like its federal counterpart,

---

20. The Court, however, gave the jury a cautionary instruction which read:
   "Ladies and Gentlemen of the jury, on the second statement made by defendant on page 16, there is a reference that he smoked pot the Saturday before the alleged incident. This is in no way to be considered by you as any evidence of his guilt, to judge his credibility or anything of that nature...."

21. D.R.E. 402 provides that, "All relevant evidence is admissible.... Evidence which is not relevant is not admissible."

22. D.R.E. 404(b) reads as follows:
   **(b) Other Crimes, Wrongs or Acts.** Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

admits evidence of other crimes or acts relevant to a trial issue, except where the evidence tends to prove only criminal disposition. *See United States v. Shaw*, 5th Cir., 701 F.2d 367, 386 (1983); *United States v. Bradshaw*, 9th Cir., 690 F.2d 704, 708 (1982).

▉ We agree with the State that the defendant's reference to having earlier smoked pot was admissible as tending to establish the voluntariness of the defendant's statement, an issue disputed at trial. *See supra* II. It also tended to show the cordial atmosphere of the interrogation and that defendant was not afraid to volunteer information about a prior criminal act. The response also established that defendant was not under the influence of drugs when he gave the statement. Furthermore, the Court's cautionary instruction, *supra* note 20, negated any claim of unfair prejudice to the defendant. *See* D.R.E. 403.[23] Therefore, we cannot conclude that the Court abused its discretion in refusing to excise the statement; and, on the contrary, the Court properly admitted the evidence in accordance with D.R.E. 402, 403, and 404.

**B.**

Defendant next contends that the Trial Court erred as a matter of law when it instructed the jury to consider the provisions of 11 *Del.C.* § 469 in determining whether defendant acted in self-defense.[24] At trial, defendant argued that Luzier confronted him with a gun and that he shot her in self-defense during a struggle. Accepting the defendant's argument that the justification of self-defense was applicable to a killing by a burglar, the Court charged the jury on the elements of 11 *Del.C.* § 464(a), (c) and (e).[25] Section 464(a), however, only justifies the use of force upon another person when "the defendant believes such force is immediately necessary for the purpose of protecting himself against the use of *unlawful* force...." 11 *Del.C.* § 464(a) (emphasis added).

▉ The Court proceeded to define unlawful force according to 11 *Del.C.* 471(c)[26] and then, over defendant's objection, instructed the jury that it must consider 11 *Del.C.* § 469, *supra* note 24, in determining whether or not Luzier used unlawful force against the defendant. However,

**23.** D.R.E. 403 excludes relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice."

**24.** 11 *Del.C.* § 469 provides as follows:
§ **469. [Justification]—Person unlawfully in dwelling.**
In the prosecution of an occupant of a dwelling charged with killing or injuring an intruder who was unlawfully in said dwelling, it shall be a defense that the occupant was in his own dwelling at the time of the offense, and:
(1) The encounter between the occupant and intruder was sudden and unexpected, compelling the occupant to act instantly; or
(2) The occupant reasonably believed that the intruder would inflict personal injury upon the occupant or others in the dwelling; or
(3) The occupant demanded that the intruder disarm or surrender, and the intruder refused to do so.

**25.** The jury charge read:
The defense of justification is defined in Title 11, Section 464, et seq., and reads in pertinent part as follows:

"The use of force upon or toward another person is justifiable when the defendant believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion. The use of deadly force is justifiable under this section if the defendant believed that such force is necessary to protect himself against death or serious physical injury.
The use of deadly force is not justifiable under this section if the defendant, with the purpose of causing death or serious physical injury, provoked the use of force against himself in the same encounter, or the defendant knows that he can avoid the necessity of using deadly force with complete safety by retreating."

**26.** Section 471(c) defines unlawful force as "force which is employed without the consent of the person against whom it is directed and the employment of which constitutes an offense ... not amounting to a privilege to use the force...."

section 469 is applicable only "[i]n the prosecution of an occupant of a dwelling charged with killing or injuring an intruder who was unlawfully in said dwelling...." 11 *Del.C.* § 469. Thus, the Trial Court erred as a matter of law when it instructed the jury to consider section 469 because defendant was not an occupant of a dwelling charged with killing or injuring an unlawful intruder. Section 469 would be applicable if the defendant were in his own home when the victim entered unlawfully, but not in this case since the defendant was the intruder.

■ However, the Court's instruction on 11 *Del.C.* § 469, though erroneously given, was harmless error at best because it was not prejudicial to defendant. The physical evidence at trial negated that any struggle had taken place. The police found Luzier with her door keys clutched in her hand. Also a fiber analysis test of the defendant's and Luzier's clothing established that their clothing never touched. Similarly, all the shots were fired at a downward angle, which indicated that defendant was standing over Luzier and not stuggling with her. The State also refuted the defendant's testimony that Luzier had originally been carrying the gun. The State's evidence showed that Luzier never carried the gun on her person and that the police found her purse closed after the murder.

Thus, in light of the evidence, the Court's erroneous instruction on 11 *Del.C.* § 469 was harmless error.

### C.

■ We address defendant's final contention—that the Trial Court abused its discretion in refusing to hold an evidentiary hearing to receive "new" matter subsequent to *State v. Blount*, Del.Super., 472 A.2d 1340 (1984), *aff'd*, Del.Supr., 511 A.2d 1030 (1986), on the *Witherspoon* issue.[27] Based on the Federal District Court's decision in *Grigsby v. Mabry*, E.D.Ark., 569 F.Supp. 1273 (1983), *aff'd*, 8th Cir., 758 F.2d 226 (1985) (*en banc*), *rev'd sub nom.*, *Lockhart v. McCree*, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), defendant filed a pretrial motion requesting separate issues at the guilt and penalty phases of his trial. The Court, however, relying upon *Blount, supra*,[28] denied the defendant's request. One day prior to the trial proceedings, defendant renewed his motion and asked for an evidentiary hearing to present "new" evidence on the conviction proneness of death qualified juries.

In support of his new motion, the defendant submitted the affidavit of Dr. Valerie Hans, a professor at the University of Delaware, who testified on behalf of the defendant in *Blount*. Dr. Hans' affidavit indicated that subsequent to the hearing in *Blount*, a publication of *Law and Human Behavior* was released which dealt exclusively with the issue of death qualified

---

**27.** Under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), a death-qualified jury is obtained by excluding potential jurors, for cause, from participating in deciding the defendant's guilt or innocence, if, on *voir dire*, they express adamant opposition to the death penalty such that under no circumstances could they return a sentence of death after having found the defendant guilty. The Court, however, hypothesized that a future defendant might attempt to establish that a death-qualified jury was less than neutral with respect to guilt. *Id.* at 520 n. 18, 88 S.Ct. 1776 n. 18. If a defendant could establish that, then the question would arise whether the State's interest in submitting the penalty issue "to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest

in a completely fair determination of guilt or innocence." *Id.*

In *Lockhart v. McCree*, — U.S. —, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Court held, assuming *arguendo*, that social science studies establish that death-qualified juries in fact produce juries somewhat more conviction prone, the fair cross-section requirement of the Sixth Amendment does not prohibit the states from death qualifying juries in capital cases.

**28.** In *Blount*, after hearing expert testimony and reviewing numerous studies, the Superior Court held that the defendant had not sustained his burden of establishing that a death-qualified jury is less neutral in determining the issue of guilt. 472 A.2d at 1347.

juries. Defendant, however, was unable to explain what new evidence Dr. Hans could present that was not before the Court in *Blount.* Therefore, the Court ruled that the defendant had failed to carry his burden of establishing that the proffered evidence was new or different and that his late presentation precluded adequate consideration of the issue.[29]

We hold that the Court correctly denied the defendant's request for an evidentiary hearing because all the studies in the issue of *Law and Human Behavior* were before the Court in *Blount.*[30] The studies were either (1) presented by Dr. Hans in her directed testimony; or (2) discussed in the cases that the *Blount* Court carefully analyzed. *See Blount,* 472 A.2d at 1343–46; *Grigsby v. Mabry, supra; Keeten v. Garrison,* W.D.N.C., 578 F.Supp. 1164 (1984); *Hovey v. Superior Court,* Cal.Supr., 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980). Absent any new or different evidence, it was unnecessary for the Court to hold an evidentiary hearing. Thus, the Trial Court did not abuse its discretion.

\*     \*     \*

Affirmed.

---

**29.** Although the Court held that the defendant could supplement the record by presenting a further affidavit detailing how the evidence was different from that considered in *Blount,* he never presented any further information from Dr. Hans.

**30.** At the time of the hearing in *Blount,* some of the studies were in prepublication drafts with slightly different names. However, absent any evidence that the prepublication drafts were incomplete, the mere publication of the articles does not make the data new or different, sufficient to require a hearing on "conviction proneness." *People v. Sirhan,* Cal.Supr., 7 Cal.3d 710, 102 Cal.Rptr. 385, 411, 497 P.2d 1121, 1147 (1972), *cert. denied,* 410 U.S. 947, 93 S.Ct. 1382, 35 L.Ed.2d 613 (1973).