# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE ) 
) 
) Cr. ID. No. 1806009134 
) 
v. ) 
) 
RYAN T. BOYD, ) 
) 
Defendant. ) 
) 
) 
) 
) 
) 
) 
) 
) 

Submitted: June 18, 2019
Decided: June 25, 2019

Upon Defendant's Motion to Suppress
**GRANTED IN PART, DENIED IN PART**

## <u>MEMORANDUM OPINION</u>

Matthew C. Bloom, Esq., Department of Justice, Wilmington, Delaware, *Attorney for the State*

Joe Hurley, Esq., *Attorney for Defendant*

**JOHNSTON, J.**

1

## FACTUAL AND PROCEDURAL CONTEXT

On May 8, 2018, after receiving a tip from an informant, law-enforcement officers visited the home of Defendant, Ryan T. Boyd. The informant alerted the officers to pipe bombs contained within Defendant's garage. Defendant's mother gave the officers consent to search the home, including the garage, where Defendant spent a lot of his time. The officers found three pipe bombs inside of a cooler bag on the garage floor.

Upon discovering the pipe bombs, a detective conducted an informal interview of Defendant on scene. Defendant denied having any knowledge about the pipe bombs.

On May 16, 2018, the State Fire Marshals brought Defendant in for a formal interview. Again, Defendant denied having any knowledge about the pipe bombs.

On June 13, 2018, Defendant agreed to take a polygraph examination, which was followed by another interview.[1] It was revealed to Defendant that he did not perform well on the polygraph examination. Defendant stated that he was not happy with the results of the examination because he thought the results would exonerate him. During the subsequent two-hour interview, Defendant vacillated between denials, inculpatory statements, and recanting. After the interview,

---

[1] Defendant was read his *Miranda* rights prior to each of the formal interviews.

Defendant reportedly told his mother that he "told them the bull**** they wanted to hear."

On June 28, 2018, Defendant returned to the Fire Marshal's office to make a statement. Accompanied by counsel, Defendant recanted the inculpatory statements made during the June 13 interview. Defendant has moved to suppress the statements given during the interviews.

## STANDARD FOR A MOTION TO SUPPRESS

The Due Process Clause of the Fourteenth Amendment requires that a defendant's statement to law-enforcement be voluntary to be admissible against him at trial.[2] The State must prove voluntariness by the preponderance of the evidence.[3]

## ANALYSIS

### Voluntary or Involuntary Statement

Whether a statement was given voluntarily is a question of fact based on the totality of the circumstances.[4] The Court must determine whether the

---

[2] *State v. Sumner*, 2003 WL 21963008, at *19 (Del. Super.)(citing *Brown v. Mississippi*, 297 U.S. 278 (1936)).
[3] *Sumner*, 2003 WL 21963008, at *19.
[4] *Baynard v. State*, 518 A.2d 682, 690 (Del. 1986).

investigators' conduct overbore the defendant's will to resist, and elicited a statement that was not the product of a rational intellect and free will.[5] The Court must consider "the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the defendant."[6] "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."[7] Factors the Court can consider are:

> the youth of the accused;

> any lack of education or low intelligence;

> the lack of any advice to the accused of constitutional rights;

> the length of detention;

> the repeated and prolonged nature of the questioning; and

> the use of physical punishment such as the deprivation of food or sleep.[8]

Relinquishment of a right "must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

---

[5] *Id.* at 690-91.
[6] *Id.* at 690.
[7] *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).
[8] *Id.*

deception."[9] The defendant must have "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."[10] Coercion is determined from the perspective of the accused.[11] An interrogator's statements are not coercive when those statements have some basis in law.[12]

In *Lynumn v. Illinois*,[13] the United States Supreme Court held that threatening to take a mother's children away unless she cooperated led to an involuntary and coerced statement.[14] The police threatened to take the defendant's children away if she did not confess to possession and sale of marijuana.[15]

However, threats involving family members do not necessarily yield coerced statements. In *State v. Janusiak*,[16] the defendant was charged with first-degree intentional homicide following the death of a four-month-old baby while in the defendant's care.[17] During an interview, a social worker told the defendant that she would lose her children if they found out she hurt the baby.[18] The court distinguished *Lynumn*, stating that Janusiak was not threatened with the loss of her

---

[9] *Moran v. Burbine*, 475 U.S. 412, 421 (1986).
[10] *Id.*
[11] *Illinois v. Perkins*, 496 U.S. 292, 296 (1990).
[12] *State v. Rossitto*, 1988 WL 97863, at *9 (Del. Super.).
[13] 372 U.S. 528 (1963).
[14] *Id.* at 534.
[15] *Id.* at 530-34.
[16] 2016 WL 325526 (Wis. Ct. App.).
[17] *Id.* at *1.
[18] *Id.* at *6.

children if she refused to confess.[19] Therefore, the defendant's statements were not coerced.[20]

Promises of leniency if a defendant cooperates do not necessarily render a statement involuntary. In *Miller v. Fenton*,[21] the court held that "it is generally recognized that the police may use some psychological tactics in eliciting a statement from a suspect."[22] "For example, the interrogator may play on the suspect's sympathies or explain that honesty might be the best policy for a criminal who hopes for leniency from the state."[23]

## May 16, 2018 Interview

In the May 16, 2018 interview, Defendant consistently denied knowledge of, and involvement with, the pipe bombs. Therefore, there is no coerced statement to suppress in this interview. However, the events that took place during this interview are relevant to Defendant's state of mind in the subsequent interview.

---

[19] *Id.*
[20] *Id.*
[21] 796 F.2d 598 (1986).
[22] *Id.* at 605.
[23] *Id.*

## June 13, 2018 Interview

There a several factors indicating that the statements made during this interview were voluntary. This interview was conducted nearly a month after the May interview. Defendant was 24-years-old and a professional electrician at the time. There is no evidence that Defendant suffered from any mental health issues. Defendant was not incarcerated. There were no physical threats made to Defendant. He was not denied food or water. Defendant was read his *Miranda* rights. Any offers of beneficial treatment or leniency did not rise to the level of promises of no criminal repercussions.

However, there are several factors indicating that the statements made during this interview were involuntary. There were repeated instances of raised voices, often in a sudden and startling manner. There were repeated veiled threats to incarcerate Defendant's entire family. Defendant was told that his career was in jeopardy. Defendant's requests for cigarette breaks were all denied. The officers asked Defendant what his deceased father would want him to do and whether his father would approve of his behavior. Defendant clearly was suffering back pain, which the State did not dispute as indicating malingering.

The interviewer's tone and demeanor became increasingly loud, hostile, and aggressive. The turning point in the interview occurred when the interviewer directly threatened to put Defendant and his family members in a "holding cell"

7

that day unless the Defendant confessed in detail. Defendant attempted to stand, and the interviewer told Defendant to "sit down." Defendant sat down and immediately began to make inculpatory statements. Virtually all of the specific information relating to the pipe bombs was supplied to Defendant through detailed, leading questions. Defendant's confessory statements alternated with denials during the remainder of the interview.

After reviewing several hours of Defendant's interviews, it appears to the Court that a reasonable inference can be drawn that Defendant "confessed" to protect members of his family. That is a factor the Court may consider. However, even a reasonable inference of this nature is not dispositive. Hypothetically, an intentional false confession for the purpose of protecting another person does not mean that the statement is involuntary and should be suppressed. The issue for suppression is whether the statement was voluntary, not whether the confession is credible.

The Court finds that as of the turning point in the interview, all inculpatory statements must be suppressed. Considering the totality of the circumstances, the interrogators' behavior and threats to family members overbore Defendant's will to resist. The elicited statements were not a product of Defendant's rational intellect and free will.

8

## CONCLUSION

**THEREFORE**, Defendant's Motion to Suppress is **hereby GRANTED** as to the inculpatory statements made after the turning point in the June 13, 2018 interview. Defendant's Motion to Suppress is **hereby DENIED** as to those statements made prior to the turning point.

**IT IS SO ORDERED.**

The Hon. Mary M. Johnston