Kenneth Wesley DeSHIELDS,
Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff
Below, Appellee.

Supreme Court of Delaware.

Submitted: May 27, 1987.
Decided: Sept. 10, 1987.
Motion for Reargument Denied:
Dec. 10, 1987.

**632**

Edward C. Gill (argued) of Robert C. Wolhar, Jr. & Associates, P.A., Georgetown, and William B. Wilgus, Millsboro, for defendant below, appellant.

Richard E. Fairbanks, Jr. (argued), Chief of Appeals Div., Loren C. Meyers, Timothy J. Donovan, Jr., Bartholomew J. Dalton, Deputy Attys. Gen., Dept. of Justice, Wilmington, Gary A. Myers, Deputy Atty.

Gen., Dept. of Justice, Georgetown, for plaintiff below, appellee.

Before CHRISTIE, C.J., and HORSEY, MOORE, WALSH and HOLLAND, JJ., constituting the Court en Banc.

HORSEY, Justice:

Defendant, Kenneth W. DeShields, seeks reversal of his conviction in a jury trial of two counts of Murder in the First Degree (11 *Del.C.* § 636),[1] Robbery in the First Degree (11 *Del.C.* § 832(a)(2)), and Possession of a Deadly Weapon during the Commission of a Felony (11 *Del.C.* § 1447(a)). Following a separate penalty hearing held pursuant to 11 *Del.C.* § 4209, the jury unanimously recommended the death penalty for each murder count. DeShields was sentenced to death for each first degree murder conviction, 30 years' imprisonment for robbery, and 30 years' imprisonment for the weapons offense. On appeal, DeShields asserts multiple grounds for reversal. His principal arguments involve: (1) the jury selection process; (2) the constitutionality of the death sentence; (3) the admission of physical evidence; and (4) the prosecutor's comments to the jury. We find no reversible error and, therefore, affirm.

\* \* \* \* \* \*

The evidence at trial may at the outset be summarized as follows:

On August 11, 1984, Elizabeth Reed, an attendant at a Sussex County landfill located south of Milford and near Lincoln, a small rural community, died from a shotgun wound fired at close range shortly after 4:00 p.m. as she was preparing to leave work. She had been shot at the

---

1. Defendant was convicted of intentional murder and felony murder pursuant to 11 *Del.C.* §§ 636(a)(1) and 636(a)(2), which provide:

 § 636. **Murder in the first degree; class A felony.**

 (a) A person is guilty of murder in the first degree when:

 (1) He intentionally causes the death of another person;

 (2) In the course of and in furtherance of the commission or attempted commission of a felony or immediate flight therefrom, he recklessly causes the death of another person.

landfill and her body dragged approximately 95 feet to where it was found by her son the following day. Local residents had heard a shotgun blast coming from the direction of the landfill between 4:00 and 4:30 p.m. on August 11. One witness placed the blast at exactly 4:19 p.m.

The police soon began to focus their investigation on DeShields. For the prior month and a half, DeShields had been living near Lincoln with his girlfriend, Sadie Sample. DeShields and Sample shared living accommodations in a three-bedroom mobile home with Sample's mother, Odetta Boyd, the owner of the home, and five other relatives of Sample, including her seventeen-year-old nephew.

On Saturday, August 11, DeShields wanted to go to a family reunion out of state, but he had no money and no means of transportation. Sample could offer little assistance, then having only five dollars and no car. That morning, about 10:30 a.m., DeShields left the Boyd home, telling Sample that he was going to attempt to borrow the car of a friend, Gary Waters.

Later that afternoon, at a time estimated to be between 3:30 and 4:00 p.m., DeShields was seen by a close acquaintance driving a car at an excessive speed on a rural road between Milford and Slaughter Neck. The witness noticed DeShields because the car the witness was driving came close to colliding with the car DeShields was driving when DeShields ran a stop sign. At trial, the witness identified the car DeShields was driving, which other witnesses identified as Reed's car.

That same day, DeShields returned to the Boyd home near Lincoln between 4:30 and 5:00 p.m. He was driving a car that Sample and her nephew had never seen before, but which was identified at trial as Reed's car. When Sample asked DeShields where he had gotten the car, DeShields said that it belonged to a friend of his. Sample knew that it was not Waters' car. Sample's nephew saw a shotgun belonging

to DeShields in the back seat of the car. Her nephew observed DeShields take the shotgun out of the back seat of the car and put it in the trunk. Later he saw DeShields take a change purse out of the car, empty it, and throw it into the nearby woods.

Thereafter, DeShields, Sample, and her seventeen-year-old nephew drove off in Reed's car, traveling through Sussex and Kent Counties. While the car was parked on a side street in Dover, DeShields took the shotgun out of the trunk and sat in the car with the gun for five to ten minutes before putting it back in the trunk. They eventually returned to the mobile home at approximately 11:30 p.m. Saturday night. When DeShields said he was driving back to Dover, Sample asked him to leave the shotgun with her. DeShields wrapped the shotgun in a green garbage bag and gave it and the weapon's magazine to Sample. Sample put the shotgun in the closet of the bedroom that she and DeShields slept in and placed the gun's magazine under the mattress of their bed.

On Sunday evening, August 12, two Delaware State Police officers went to Boyd's home. They were looking for DeShields and Sample in connection with the shooting. Although neither Sample nor DeShields was there, Boyd consented when asked by the officers if they could search her daughter's and the defendant's bedroom. Boyd asserted that she had complete access to all portions of the home. In the bedroom closet, the police found the shotgun in the garbage bag and the magazine with two unexpended 20–gauge shotgun shells between the mattress and box springs of the bed.

Early the following morning, August 13, the police arrested DeShields after "spotting" him driving Reed's car. On the day of arrest, over a period of several hours, DeShields gave approximately four statements, although in several different variations, to the police. The Superior Court,

however, suppressed portions of the initial statements, finding the police to have violated DeShields' *Miranda* rights by ignoring his request, early in the interview, to postpone the questioning. The inadmissible statements led to the discovery of an expended shotgun shell casing and Reed's wallet near a dirt road approximately two-tenths of a mile from the landfill. Ballistic examination established that the shell had been fired from the gun taken from DeShields' bedroom and that the shot or pellets taken from Reed's body were consistent with the shot found within the shells hidden under the mattress.

As previously noted, based on the facts presented at trial, the jury found DeShields guilty on all charges.

## I

■■■ The first issue presented is whether the Trial Court abused its discretion by failing to excuse for cause two prospective jurors. The jurors in question, among the first to be examined by the Court, initially gave an affirmative response when asked whether they would "automatically vote for the death penalty" for a person convicted of first degree murder. Later, however, in response to the Court's restated questions, both jurors unequivocally stated that even if a verdict of first degree murder were returned, each could vote for either life imprisonment or the death penalty. DeShields contends that, based on the jurors' initial responses, the Court was required to excuse the jurors for cause and, in failing to do so, abused its discretion and violated controlling law as set forth in *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). We conclude that the Trial Court neither abused its discretion nor committed reversible error in failing to excuse the two jurors.

### A.

The primary purpose of *voir dire* is to elicit a juror's lack of bias or prejudice and

thus secure for the defendant a jury able to vote impartially upon the evidence and the law as presented at trial. *Riley v. State*, Del.Supr., 496 A.2d 997, 1004 (1985), *cert. denied*, — U.S. —, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986); *Parson v. State*, Del. Supr., 275 A.2d 777 (1971). Balanced against the defendant's right to a competent, impartial jury is the State's right to empanel jurors who can "follow their instructions and obey their oaths." *Adams v. Texas*, 448 U.S. 38, 44, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980); *Riley, supra.* Superior Court Criminal Rule 24(a), in pertinent part, states that "the Court shall permit or conduct such examination as is reasonably calculated to ascertain prejudice of a juror."

In the conduct of *voir dire*, the trial court has broad discretion in determining whether a prospective juror should be excused for cause and its discretion is restricted only by essential demands of fairness. *Hooks v. State*, Del.Supr., 416 A.2d 189, 195 (1980); *Parson, supra* at 780. The standard for excluding a juror for cause with respect to the juror's views on capital punishment as established by the United States Supreme Court in *Wainwright, supra*, is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. at 424, 105 S.Ct. at 852. The trial court's exercise of its discretion in applying the *Wainwright* standard will be overturned only upon a showing of both abuse of discretion and consequent prejudice to the defendant. *Riley, supra; Ross v. State*, Del.Supr., 482 A.2d 727 (1984), *cert. denied*, 469 U.S. 1194, 105 S.Ct. 973, 83 L.Ed.2d 976 (1985); *Hickman v. State*, Del.Supr., 431 A.2d 1249 (1981); *Hooks, supra.* DeShields has failed to show either abuse of discretion or prejudice.

### B.

The *voir dire* in this case extended over a three-day period and included both gener-

al and individual examination of the prospective jurors. The Trial Court began the *voir dire* by asking general questions of the entire array of prospective jurors. Thereafter, the Court individually examined one hundred and twelve members of the array until it seated twelve jurors and four alternates.

DeShields claims the Trial Court committed reversible error by failing to excuse for cause juror Charles Stoddart and juror Jeffrey Harris, who were among the first jurors the Court examined. The relevant portion of Stoddart's *voir dire* examination is as follows:

> **Trial Court:** Under the law of Delaware, a jury is required to consider, in the event a defendant is found guilty of first-degree murder, the possibility of a sentence of death being imposed. However, under no circumstances must a jury recommend the death sentence. Could you vote to impose the death penalty?
>
> **Stoddart:** Yes.
>
> **Trial Court:** Would you automatically vote for the death penalty if you find someone guilty of first-degree murder?
>
> **Stoddart:** Yes.

Out of the jurors' presence, the prosecutor took exception to the Court's phrasing of the death penalty questions.[2] The Trial Court then reexamined juror Stoddart as follows:

> **Trial Court:** I gave you a brief explanation concerning the procedure in the event a verdict of guilty of murder in the first degree is returned by a jury. Do you understand my explanation regarding that, particularly that if a verdict of guilty of murder in the first degree is returned, the jury then has the option to choose the punishment of either life imprisonment or death?
>
> **Stoddart:** Yes.

> **Trial Court:** And would you be able to vote for life imprisonment as a penalty?
>
> **Stoddart:** Yes.
>
> **Trial Court:** Would you be able to vote for the death penalty as a penalty?
>
> **Stoddart:** Yes.
>
> **Trial Court:** Would you be able to vote in favor of life imprisonment if you find the defendant guilty of first-degree murder?
>
> **Stoddart:** Yes.

DeShields challenged Stoddart for cause based on his original answers to the death penalty questions. DeShields argued that Stoddart's initial answers indicated that he would automatically vote for the death penalty and that his later "conflicting" responses only "confuse the issue." The Trial Court, however, denied DeShields' challenge for cause. Thereafter, DeShields exercised a peremptory challenge and the Court excused Stoddart.

The relevant portion of Harris' *voir dire* is as follows:

> **Trial Court:** Could you vote in favor of life imprisonment?
>
> **Harris:** Instead of the death penalty?
>
> **Trial Court:** Yes. Could you vote not to impose the death penalty even if you find the defendant guilty of first-degree murder?
>
> **Harris:** No.
>
> **Trial Court:** Would you automatically vote for the death penalty for a person who is convicted of first-degree murder?
>
> **Harris:** Yes.
>
> **Trial Court:** Do you understand it is the law of this state, in a case in which a verdict of guilty to first-degree murder has been returned, that such a jury is not required to recommend a sentence of death, but retains the option to vote for

2. Stoddart had been removed from the court-

room during this discussion.

life imprisonment? Do you understand that?

**Harris:** Yes.

**Trial Court:** With that background, could you vote not to impose the death penalty, even if you found the defendant guilty of first-degree murder?

**Harris:** Could I? Yes.

**Trial Court:** You could vote not to impose the death penalty?

**Harris:** Yes.

DeShields also challenged Harris for cause, contending that his initial response placed him in the "automatic death penalty" group. The Court also rejected DeShields' challenge for cause of Harris. Although DeShields then had sixteen peremptory challenges remaining,[3] he did not challenge Harris; and the Court proceeded to seat Harris as the first juror.

### C.

Determinations of juror impartiality are the responsibility of the trial judge who has the opportunity to question the juror, observe his or her demeanor, and evaluate the ability of the juror to render a fair verdict. *Williams v. State*, Del.Supr., 494 A.2d 1237, 1243 (1985). Because the trial court's findings will largely rest on the judge's personal observation of the *voir dire* proceedings and on the credibility of the parties, a reviewing court should give those findings great deference. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, —— n. 21, 106 S.Ct. 1712, 1724 n. 21, 90 L.Ed.2d 69, 89 n. 21 (1986); *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed. 2d 518 (1985); *Baynard v. State*, Del.Supr., 518 A.2d 682 (1986).

Here, the Court exercised its judgment concerning the demeanor and credibility of

the potential jurors and found that their views on capital punishment would not prevent or substantially impair the performance of their duties as jurors. Furthermore, the Court had before it Stoddart's and Harris' unequivocal responses to its clarifying explanation of a juror's option regarding the sentencing procedure in the event of a verdict of guilty of murder one: of chosing either life imprisonment or the death penalty. On this record, we find no abuse of discretion in the Court's refusal to excuse Stoddart and Harris for cause for initial juror confusion due, we conclude, to an initial series of inaptly phrased questions, which the Trial Court promptly clarified.

DeShields has also failed to establish (or even articulate) actual prejudice from the Court's actions. *See Riley*, 496 A.2d at 1004. Stoddart did not take part in DeShields' conviction or sentence because DeShields exercised one of his peremptory challenges against him. *Accord Williams, supra* at 1243 (no prejudice where arguably biased alternate juror took no part in deliberations). Although Harris was seated on the jury, DeShields had, by then, exercised only four of his twenty peremptory challenges; and DeShields could have struck Harris from the panel by using one of his sixteen remaining challenges. Additionally, DeShields has failed to show that an antagonistic juror was subsequently seated because he had to use a peremptory challenge against Stoddart. Therefore, DeShields is unable to establish either abuse of discretion or actual prejudice.

### II

■ Secondly, we take up the question of the propriety of the Trial Court's ruling

---

3. Superior Court Criminal Rule 24 provides, in pertinent part, as follows:

 **(b) Peremptory Challenges.** In capital cases the State shall be entitled to 12 peremptory challenges and the defendant or defendants shall be entitled to a total of 20 peremptory challenges. In capital cases the right to challenge shall be exercised against each juror immediately upon conclusion of the examination of such juror and the defendant or defendants shall exercise or refuse to exercise the right to challenge before the State is called upon to do so.

admitting in evidence under the inevitable discovery exception the shotgun shell casing and Reed's wallet, though obtained through DeShields' initial unlawful interrogation. We conclude that the Trial Court's finding that such evidence would have inevitably been discovered is fairly supported by the record and not clearly erroneous. We also conclude that DeShields' later properly admitted statements would have independently led to the discovery of the same evidence.

### A.

The day of his arrest, on August 13, 1984, DeShields gave a series of four statements, three tape recorded and one unrecorded, to the police. The first statement began at 10:23 a.m. and ended at 12:21 p.m. The questioning continued at 1:45 p.m. and ended at 2:46 p.m. Both statements were recorded. During the first taped statement, DeShields stated, "I need some time to think." However, the police ignored his request and continued their questioning. Although DeShields initially denied any knowledge of the murder, he eventually told the police that he had been with a man named "Blair" when Blair had killed Reed.

Later the same day, at approximately 4:00 p.m., DeShields told the police that he wanted to talk to Detective Hudson. Hudson testified that in this unrecorded statement, DeShields told him that after Blair and he had driven from the dump, Blair had thrown a rake into a ditch and driven down a woods road near the dump to discard several items from the robbery.[4] Hudson then searched the landfill area and found the disputed evidence—the expended shotgun shell casing and Reed's wallet.

Later that day, at approximately 5:00 p.m., while Hudson was at the landfill, DeShields contacted Detective Passwaters and stated that he wished to go into further detail about his earlier statement. In this taped statement, the following exchange occurred:

**Passwaters:** Did you see him [Blair] throw the purse away?

**DeShields:** No but I seen him pull it away but I know that purse is right down the road.

**Passwaters:** How do you know that?

**DeShields:** Cause like I said when he came back the rake was gone & he didn't go too far down the road.

**Passwaters:** You didn't see him go in the woods with her or anything?

**DeShields:** No sir.

During a pretrial suppression hearing, the Trial Court found that the police had ignored DeShields' request, made early in his first tape recorded statement, to postpone the questioning. The Court held that the police violated DeShields' *Miranda* rights and suppressed all of his statements made after the request until he voluntarily reinitiated contact with Passwaters shortly after 5:00 p.m. that afternoon.[5]

The Court, however, refused to suppress the expended shotgun shell casing and Reed's wallet that were found on the basis of DeShields' statement to Hudson. The Court concluded "that these particular items of evidence would have been discovered by virtue of the general police policy to search the area." At trial, the State did not introduce any of DeShields' post-arrest statements into evidence. However, the shell casing and wallet were admitted into evidence, and an expert testified that the

---

4. The State never produced the substance of this oral statement in response to DeShields' request for discovery.

5. Since DeShields never requested counsel, the governing standard for permissible reinterroga-tion is *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and not *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), as defendant argues.

shell casing had been fired from DeShields' shotgun.

### B.

A prosecutor may use physical items located as a result of a statement obtained in violation of the Fifth Amendment or the dictates of *Miranda* "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams,* 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377, 387 (1984). Where the prosecution can show that the standard prevailing investigatory procedure of the law enforcement agency would have led to the discovery of the questioned evidence, the inevitable discovery exception will be applied to prevent suppression of the evidence. *See Martin v. State,* Del.Supr., 433 A.2d 1025, 1031–32 (1981), *cert. denied,* 454 U.S. 1151, 102 S.Ct. 1018, 71 L.Ed.2d 306 (1982); *Cook v. State,* Del.Supr., 374 A.2d 264, 268 (1977).

DeShields does not contest this principle of law; he simply argues that the evidence of record is "inadequate" to sustain its application to this case. He reasons that the shell casing (the only direct evidence linking the killing to defendant's shotgun) was not found "directly" in the landfill area. The record indicates that the casing and the victim's wallet were found approximately fifteen feet east of a woods or dirt road and approximately one thousand feet from the dump site. DeShields, therefore, asserts that there was no testimony that the state police would have conducted such an extensive search of the area around the landfill so as to discover these items.

The Trial Court's determination that the evidence would have been inevitably discovered constitutes a finding of fact. *Nix,* 467 U.S. at 448–50, 104 S.Ct. at 2511–12. Such a finding, unless clearly erroneous and not supported by the record, may not be overturned by a reviewing court. *Id.; see also* *Government of Virgin Islands v. Gereau,* 3d Cir., 502 F.2d 914, 927–28 (1974), *cert. denied,* 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed. 2d 839 (1975).

Two police officers testified that it was routine police practice to extensively search the general area in a homicide case and that this practice was followed in this case. The police had searched the landfill compound and several county roads which crisscrossed the area. Thus, we think it only reasonable to conclude, as did the Trial Court, that this search procedure would have continued to encompass the dirt road where the items were found—one thousand feet from the landfill. Furthermore, the evidence was neither susceptible to deterioration or decomposition nor was it concealed. Finally, the police knew that Reed had been killed by a shotgun and apparently robbed, and yet the power piston or wad and shell had not been found, nor had victim's pocketbook. Accordingly, under the facts of this case, the admission of the expended shell casing and wallet in evidence was not error. The Trial Court's finding that the items would have been discovered is adequately supported by the record and not clearly erroneous.

Assuming the inevitable discovery rule were inapplicable, DeShields' subsequent admissible statement to Passwaters would have ultimately led to the discovery of the same evidence. DeShields' statements to Passwaters concerning the location of the woods road were virtually identical to the statement defendant had made earlier to Hudson. Thus, the only effect of the inadmissible statement was to delay, not prevent, the discovery of the incriminating items.

### III

The third question we address is whether death by hanging constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States

Constitution and Article I, section 11 of the Delaware Constitution.[6]

On April 4, 1986, the Trial Court sentenced DeShields to die for the murder of Reed. In accordance with 11 *Del.C.* § 4209(f) (1979), the Court directed that DeShields be executed by means of hanging. However, two months later, the Delaware Legislature changed the method of inflicting capital punishment from hanging to the intravenous injection of a lethal substance. 65 *Del.Laws*, chapter 281, section 1. Basing his argument solely on legislative comments made during the debate of chapter 281, DeShields asserts that death by hanging is unconstitutional.

The State counters: (1) that DeShields lacks standing to challenge the constitutionality of death by hanging; and (2) that execution by means of hanging is constitutional.

A.

We agree with the State that DeShields lacks standing to challenge the constitutionality of death by hanging. Section 3 of chapter 281, now codified in part as 11 *Del.C.* § 4209(f), explicitly states "that any person sentenced to death for acts committed prior to the enactment of this act shall be permitted to elect lethal injection, as provided herein, as the method of death." DeShields can avoid hanging and any unnecessary pain and degradation which he suggests hanging entails by choosing execution by lethal injection.[7] Since section 3 gives DeShields a means to redress or moot his constitutional objection to hanging, his

constitutional challenge is non-justiciable. *Mills v. Trans Caribbean Airways, Inc.,* Del.Supr., 272 A.2d 702, 703 (1970). DeShields does not argue that death by lethal injection is more onerous than death by hanging; nor does he argue that it is cruel and unusual punishment to force him to choose the manner of his execution. *See State v. Rupe,* Wash.Supr., 101 Wash.2d 664, 683 P.2d 571, 593–94 (1984) (requirement that convict choose between hanging and lethal injection is not cruel punishment).

We find that, given the legislature-enacted alternative of death by lethal injection, DeShields lacks standing to challenge the constitutionality of death by hanging. If DeShields rejects the option to die by lethal injection, he will have waived the constitutional objection to hanging. *See Gilmore v. Utah,* 429 U.S. 1012, 1017, 97 S.Ct. 436, 439, 50 L.Ed.2d 632, 635 (1977). Therefore, it is unnecessary for this Court to render an opinion on the constitutionality of death by hanging. *See Downs v. Jacob,* Del. Supr., 272 A.2d 706, 708 (1970) (a constitutional question will not be decided unless it is essential to the disposition of the case).

B.

Assuming DeShields had standing to challenge the constitutionality of death by hanging, his arguments would nevertheless fail. Individual legislators' comments that hanging is "barbaric" do not constitute formulated state policy that hanging now violates the Delaware Constitution. Although legislative action gives expression to the public will, history is not without importance in determining whether a particular

---

**6.** The Eighth Amendment provides as follows:
 "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted."

 Article I, section 11 provides as follows:
 "Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishments inflicted."

 The Eighth Amendment applies to the States through the Due Process Clause of the Fourteenth Amendment. *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

**7.** A statute which provides an optional method of death is not *ex post facto* legislation or an unlawful bill of attainder. *Malloy v. South Carolina,* 237 U.S. 180, 35 S.Ct. 507, 59 L.Ed. 905 (1915); *State v. Fitzpatrick,* Mont.Supr., 684 P.2d 1112 (1984).

form of punishment is cruel under the State Constitution. *State v. Cannon*, Del. Supr., 190 A.2d 514, 516–18 (1963).

For nearly two hundred and fifty years, the Delaware legislature has consistently selected hanging as the method of execution.[8] Furthermore, during the debates of chapter 281, several legislators explicitly disclaimed any intention to declare hanging unconstitutional. And, most importantly, chapter 281, section 1 provides that if death by lethal injection is declared unconstitutional "death shall, in all cases, be inflicted by hanging by the neck." 65 *Del.Laws*, ch. 281, section 1. Therefore, inasmuch as chapter 281: (1) preserves hanging as an option for those already sentenced to die; and (2) retains hanging as the method of death if death by lethal injection is declared unconstitutional, we cannot find a legislative intent to declare hanging unconstitutional. Nor can we rule, as a matter of law, that death by hanging is "cruel" in violation of Article I, section 11 of the Delaware Constitution.[9]

Finally, we decline to rule that death by hanging is "cruel and unusual" punishment in violation of the Eighth Amendment. DeShields has not offered any facts for the Court to conclude that hanging, if properly performed, involves the infliction of pain beyond "the mere extinguishment of life" so as to cause "unnecessary torture or a lingering death" or unneeded "terror, pain, or disgrace." *In re Kemmler*, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890); *Wilkerson v. Utah*, 99 U.S. (9 Otto) 130, 25

8. *See* 11 *Del.C.* § 3909(a) (1953); Rev.Code § 5329 (1935); Rev.Code § 4837 (1915); Rev. Stat. ch. 133 § 30 (1852); 7 *Del.Laws* (Code) [158] (1829); 6 *Del.Laws*, § 4 (1826); 1 *Del. Laws*, ch. 84a.

9. No court has so ruled. *See, e.g., State v. Coleman*, Mont.Supr., 185 Mont. 299, 605 P.2d 1000, 1058–59 (1979), *cert. denied*, 446 U.S. 970, 100 S.Ct. 2952, 64 L.Ed.2d 831 (1980); *State v. Frampton*, Wash.Supr., 95 Wash.2d 469, 627 P.2d 922, 944, 945, 952 (1981); *see also Gray v. Lucas*, 5th Cir., 710 F.2d 1048, 1061, *cert. denied*, 463 U.S. 1237, 104 S.Ct. 211, 77 L.Ed.2d 1453 (1983).

L.Ed. 345 (1879). Nor has DeShields offered any evidence to establish that the procedures for hanging are so susceptible to accidents resulting in unnecessary torture or degradation that the choice of hanging as the method of death constitutes a deliberate indifference to the purposeless and needless imposition of pain and suffering. *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422, *reh'g denied*, 330 U.S. 853, 67 S.Ct. 673, 91 L.Ed. 1295 (1947).

## IV

■ The fourth question to be addressed, raised by DeShields for the first time on appeal, is whether the prosecutor in rebuttal summation committed plain error by commenting on defendant's failure to testify in violation of his Fifth Amendment right to remain silent. We decline to find the prosecutor's comments to have so prejudiced defendant's right to a fair trial as to constitute plain error. *Wainwright v. State*, Del.Supr., 504 A.2d 1096, cert. denied, —— U.S. ——, 107 S.Ct. 236, 93 L.Ed.2d 161 (1986); D.R.E. 103(d).[10]

### A.

In closing argument, defense counsel did not argue the facts of the case, conceding that "[m]ost of the evidence [was] not disputed at all." However, he did suggest to the jury four scenarios to explain the killing.[11] Counsel then emphasized that the

10. D.R.E. 103(d) provides as follows:

**(d) Plain Error.** Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

11. The four scenarios were as follows:

**Defense Counsel:** The first is the State's version, as presented to you during opening argument of [the prosecutor], that Kenny DeShields acted alone. That he laid in wait that Saturday in order to shoot Mrs. Reed, so that he could take her car and go to a family reunion. He told you that the family reunion was down

State had failed to account for DeShields' whereabouts throughout the day of the Reed homicide.

In rebuttal, the prosecutor responded to defense counsel's versions of the four scenarios by arguing: (1) that the other people were not present at the critical time; (2) that the State need only prove that DeShields was at the landfill when the murder occurred; and (3) that DeShields' whereabouts at other times during the day were not critical. The prosecutor then commented that since there was no alibi defense, "So who is left? Kenneth Wesley DeShields is the one that is left." [12] Although DeShields now asserts that this statement constitutes plain error, defense counsel did not make a contemporaneous objection at trial.

### B.

It is settled law that the Fifth Amendment bars the prosecutor from commenting on a defendant's failure to testify.[13] *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106, *reh'g denied*, 381 U.S. 957, 85 S.Ct. 1797, 14 L.Ed.2d 730 (1965); *Hughes v. State*, Del.Supr., 437 A.2d 559, 573 (1981); *Hooks v. State*, Del. Supr., 416 A.2d 189, 206 (1980). The prosecutor, however, is free to comment on the evidence and the reasonable inferences to be drawn therefrom. *Hughes, supra; Hooks, supra.*

We conclude that the prosecutor's statements did not create an impermissible inference of guilt. We view the objected-to statement not as a comment on defendant's failure to testify, but as fair comment on (1) the absence of an alibi defense from other witnesses; and (2) the "anybody but [defendant]" defense, i.e., the absence of any evidence that someone other than DeShields committed the crime. Defense counsel's failure to register a contemporaneous objection at trial also buttresses our view that the prosecutor's statements were not, at the time, interpreted by counsel as being directed to DeShields' right to remain silent. In any event, any possible prejudice was cured by the Trial Court's instruction that the failure of the accused to testify is not to be construed as an indication of guilt.[14]

---

south somewhere, in North Carolina, or whatever.

The second possible version of what happened is that Kenny DeShields acted in conjunction with some other people, some other person or persons, in order to steal Mrs. Reed's car, and one of those other persons shot Mrs. Reed, rather than Kenny.

The third possible version is that Kenny DeShields was at the landfill that day at the time of the murder and that someone else, with his knowledge, shot the woman without his assistance. In other words, he did not participate in the shooting, despite the fact that he was there, and then, thereafter, Kenny DeShields received an automobile.

The fourth possible version is that Kenny DeShields went with some other persons to the landfill and did not know that Mrs. Reed was shot, and then got the automobile and the money from the person who actually did the shooting.

**12.** The entire statement of the State that DeShields now objects to is as follows:

The State cannot prove where he was every minute of the day, but he is not charged with being around and about on that day. He is charged with where he was at 4:19, and that is at that landfill. We, frankly, think it is irrelevant where he was earlier in the day, and you can speculate and you can come up with this guess and that guess. I suppose if the defense had witnesses to show you where he was earlier that day, you would have seen them. You did not. So who is left? Kenneth Wesley DeShields is the one that is left.

**13.** The Fifth Amendment was made applicable to the states through the Fourteenth Amendment in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

**14.** The Trial Court gave the jury the following instruction:

The failure of a person accused of a crime to testify must not be construed or commented upon as an indication of his guilt. The defendant has a constitutional right to testify or not to testify, as he chooses. The fact that the defendant did not testify must not be construed by you as an indication that the defendant is guilty of the crime charged.

## C.

We must also reject defendant's related claim that the prosecutor improperly appealed to the jury's sympathy in asking that it do justice and have someone pay the price for the murder of "this good woman." DeShields objected to this statement and moved for a mistrial. The Trial Court, however, denied the motion.

A guilty verdict must be based upon the evidence and the reasonable inferences therefrom, not on an irrational response which may be triggered if the prosecution unfairly strikes an emotion in the jury. *Hughes, supra* at 572. Appeals to sympathy and jurors' emotions are impermissible because they go beyond the facts of the case and the reasonable inferences from the facts. *Hooks, supra* at 206; *see also Reed v. United States*, D.C.App., 403 A.2d 725 (1979); *Bonner v. State*, Md.Ct.App., 43 Md.App. 518, 406 A.2d 646 (1979); *State v. Conner*, Me.Supr., 434 A.2d 509 (1981). "Of course, it is not improper to call the jury's attention to the public policy against crime. But the focus should be on the evidence of the crime at issue." *Hooks,* 416 A.2d at 206.

In contrast to *Hooks*, the prosecutor's statements focused on the evidence in this case, i.e., bringing Reed's killer to justice. Therefore, we find that the prosecutor's reference to the victim did not impermissibly draw the jury's attention away from the evidence in this case.

Even if the prosecutor's statements could be characterized as improper, DeShields' right to a fair trial was not prejudiced. *Brokenbrough v. State*, Del.Supr., 522 A.2d 851 (1987); *Hooks, supra*. In *Hughes*, this Court adopted a three-prong test to determine whether improper prosecutorial remarks require the reversal of a conviction because they have prejudicially affected substantial rights of the accused. *Hughes, supra* at 571. The *Hughes* test requires us to examine: (1) the centrality of the issue affected by the alleged error; (2) the closeness of the case; and (3) the steps taken to mitigate the effects of the alleged error. *Id.* Here, Reed's character was not at issue; the State's case was strong; and the Trial Court instructed the jury "not to be influenced by passion, prejudice, sympathy...." Record at I-69, *DeShields* (Nos. 84-08-0075, -1075, -1275, -2075); *see also Diaz v. State*, Del.Supr., 508 A.2d 861, 866-67 (1986). Thus, based upon this record, the Court did not abuse its discretion in denying DeShields' motion for a mistrial.

## V

DeShields also raises five additional grounds for reversal. Although we find no basis for reversible error in any of these issues, we will address each in turn.

## A.

DeShields argues that the Trial Court erred in failing to suppress the fruits of the search of DeShields' bedroom and closet of the Boyd home—even though the search was made with Boyd's consent. Relying principally on *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 249-50 (1974), DeShields argues that Boyd did not possess the "common authority" over those rooms necessary for the grant of a valid consent for the search of such areas.

As previously noted, prior to his arrest, DeShields had been living with his girlfriend, Sadie Sample, for some five or six weeks in the three-bedroom mobile home of Sample's mother, Odetta Boyd. When the state police officers arrived at Boyd's home on the evening of August 12, they informed her that they were investigating a homicide and that they wished to talk to both her daughter Sadie and to DeShields. After being told that neither of them were there, the police asked if they could look inside the home. Boyd voluntarily consented to a search of the entire home, after being in-

formed that she had a right to refuse them entry. Two days later, Boyd confirmed her consent by signing a written consent form.[15]

Within the bedroom occupied by Sample and DeShields, the police found and seized a shotgun from the bedroom closet and shotgun shells from between the mattress and box spring of the bed. Sample, not DeShields, had placed the shells under the mattress and the shotgun in the closet the evening before.

DeShields moved to suppress these items as the product of an unlawful search violative of the Fourth Amendment of the United States Constitution and Article I, section 6 of the Delaware Constitution.[16] After a pretrial evidentiary hearing, the Trial Court denied DeShields' motion and the State introduced the items into evidence at trial.

Police may conduct a warrantless search if consent is obtained from a third party who possesses "common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 993, 39 L.Ed.2d 242, 250 (1974). *See also United States v. Cook*, 7th Cir., 530 F.2d 145, 148, *cert. denied*, 426 U.S. 909, 96 S.Ct. 2234, 48 L.Ed.2d 835 (1976); *People v. Seidel*, Ill.App., 115 Ill. App.3d 471, 70 Ill.Dec. 780, 782, 449 N.E.2d 1384, 1386 (1983). Common authority depends on the use of the property "by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their number might permit the common area to be

searched." *Matlock, supra*, 415 U.S. at 171 n. 7, 94 S.Ct. at 933 n. 7. Furthermore, the question of whether a third party, in this case Boyd, possessed the requisite authority over or relationship to the premises sought to be searched is a question of fact. *Seidel, supra*.[17]

The following additional facts are also relevant to the determination of this issue. Eight people, including DeShields, occupied Boyd's home at the time: Boyd; Boyd's daughter, Sadie Sample; Sample's three children; Sample's brother; and his son, Sample's nephew. The bedroom that DeShields shared with Sample was also occupied by Sample's eight-year-old daughter and six-month-old son. The closet contained the children's clothes. There were no interior locks on the door to Sample's bedroom. Boyd would occasionally enter the bedroom to get clothes for her grandchildren out of the closet. Boyd had never been told not to enter the room or that she needed permission before entering; however, when Sample and DeShields were in the bedroom, Boyd would knock before entering. Boyd considered herself as having access to the entire house. Neither Sample nor Deshields paid Boyd any rent, though Sample would, from time to time, contribute to the grocery bills of the house and the utilities' cost. In the five or six weeks that DeShields had shared the room with Sample, he had made no such contribution for groceries or utilities.

Applying a *Matlock*-type analysis to these facts, we find that Boyd had retained sufficient control or common authority over the entire premises, including the bedroom and closet where DeShields' shotgun and ammunition were found, to permit the po-

---

**15.** DeShields does not challenge the Trial Court's finding that Boyd voluntarily consented to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**16.** The Fourth Amendment prohibition against unreasonable search and seizure is applicable to the States through the Fourteenth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (overruling *Wolf v. Colora-*

*do*, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed.2d 1782 (1949)).

**17.** For other cases discussing the consent to search issue, *see, e.g., United States v. Miroff*, 7th Cir., 606 F.2d 777 (1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *United States v. Wright*, 8th Cir., 564 F.2d 785 (1977); *United States v. Mix*, 5th Cir., 446 F.2d 615 (1971).

lice search of the bedroom. We also find that through the shared use of the room DeShields had assumed the risk of Boyd's entering, especially when Sample and DeShields were not there. Therefore, the Trial Court properly denied DeShields' motion to suppress.

### B.

■ DeShields next argues that the admission into evidence at the penalty hearing of a statement defendant had made in 1976 in connection with a prior arrest and conviction was plain error. Defendant contends that the State was obligated under Superior Court Criminal Rule 16(a)(1) to produce before trial the statement in response to defendant's general pre-trial discovery request.[18] Defendant claims that the State's withholding was fundamental error.

The State had introduced DeShields' 1976 conviction of first degree robbery in order to establish the statutory aggravating circumstance set out in 11 *Del.C.* § 4209(e)(1)i. The police officer who investigated that crime referred to a statement about the robbery that DeShields made when he was arrested. At the penalty hearing, DeShields' objection went only to the voluntariness of the statement. He did not complain of the State's failure to disclose the statement in response to his pretrial discovery request. Thus, to prevail upon this issue, DeShields must establish not only that the 1976 pre-trial statement was discoverable and within the scope of his discovery request, but that its use against him, without objection, constituted plain or fundamental error. *Wainwright v. State*, Del.Supr., 504 A.2d 1096 (1986); D.R.E. 103. No such showing can be made.

The scope of defendant's discovery request under Rule 16 clearly did not embrace DeShields' statement made ten years earlier in conjunction with a totally unrelated offense.[19] Superior Court Criminal Rule 16(a)(1) is directed to statements "relevant to the crime charged." DeShields' involvement in the 1976 robbery and his related statement had no relevance to the determination of his guilt or innocence for the 1984 offenses for which DeShields stood charged.

Federal Criminal Rule 16, from which Superior Court Criminal Rule 16 is adopted, is intended to enable defendant to obtain prior to trial any statement made by him relevant to the crime charged. *United States v. Gleason*, 2d Cir., 616 F.2d 2, 24 (1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767 (1980); *see also United States v. Garrett*, S.D.N.Y., 305 F.Supp. 267, 268 (1969); *United States v. Federman*, S.D.N.Y., 41 F.R.D. 339, 341 (1967). Thus, the State was not obligated to produce DeShields' 1976 statement in response to his Rule 16(a)(1) discovery motion.

Furthermore, in cases involving late disclosure of inculpatory statements, it is the responsibility of defense counsel to bring the matter of potential prejudice to the attention of the court and either request a continuance or move for a ruling excluding

18. Superior Court Criminal Rule 16(a)(1) provides as follows:

 **(a) Defendant's Statements; Reports of Examinations and Tests; Defendant's Grand Jury Testimony.** The defendant may serve upon the Attorney General a request to permit the defendant or someone acting in his behalf to inspect and copy or photograph any relevant (1) written or recorded statements or confessions made by the defendant, or a co-defendant (whether or not charged as a principal, accomplice or accessory in the same or in a separate proceeding), or copies thereof, and the substance of any oral statement which the State intends to offer in evidence at the trial made by the defendant whether before or after arrest in response to interrogation by any person then known to the defendant to be a state agent which are known by the Attorney General to be within the possession, custody or control of the State.

19. Attached hereto as Exhibit A is copy of defendant's request for discovery under Rule 16. Attached as Exhibit B is copy of the State's response.

the objectionable testimony. *United States v. Espericueta-Reyes*, 9th Cir., 631 F.2d 616, 623 (1980). In the face of DeShields' silence, we decline to fault the Trial Court for allowing the police officer to testify about the non-disclosed statement. *United States v. Pineros,* 2d Cir., 532 F.2d 868, 872 (1976). Finally, DeShields has not established any prejudice flowing from the non-disclosure of his 1976 statement. Hence, his claim of plain error must be rejected.

### C.

We next address another defense contention first raised on appeal: that the prosecutor's opening summation during the penalty phase hearing constituted "sandbagging" in violation of this Court's holding in *Bailey v. State,* Del. Supr., 440 A.2d 997 (1982). Sandbagging, in the sense there defined, can deprive a defendant of a fair trial when a prosecutor omits from his opening summation a salient argument of the State's case only to bring forth the argument in closing after the defense has arguably been induced to avoid the subject in closing. *Bailey, supra* at 1000–04. It is unfair and often highly prejudicial for State's counsel to skirt, if not avoid, treatment of a significant matter or issue until closing rebuttal so as to lull or mislead defendant in framing the closing response. *Id.* at 1002. Thus, the State may neither avoid an issue nor address it in a perfunctory way in its opening summation and then convert its rebuttal into its argument in chief upon the issue. *Id.* at 1003.

Defendant asserts that sandbagging occurred in the penalty phase of this case in this manner: the State limited its opening statement to a bare five minutes, in which it focused primarily upon the statutory aggravating circumstances upon which it relied and omitted any extended discussion of the victim. After the defendant's closing, the State then spoke for almost six minutes in rebuttal and dwelt at length upon victim Reed's character. In our view, the record does not bear out defendant's "sandbagging" charge.

The record discloses that the State prosecutor, in his opening summation, after discussion of the three statutory aggravating circumstances relied upon (defendant's prior conviction of robbery; the victim's being over sixty-two years old; and defendant's being on parole at the time of the killing), did address defendant's crime and the victim's circumstances. The prosecutor stated: "[He] ambushed a defenseless, elderly woman who was doing nothing more than working.... He shot her down for a car and for a few dollars and for some change." [20] On this record, we cannot conclude that the State engaged in improper conduct by avoiding the issue of the crime and the victim's circumstances and reserving it for rebuttal. *See Grayson v. State,* Del.Supr., 524 A.2d 1, 3 (1987). The record also fails to support DeShields' assertion that the rebuttal summation was significantly longer than the prosecutor's opening summation. [21]

Equally without merit is DeShields' argument that the prosecutor's comments in rebuttal, not objected to at trial, illegally shifted the burden of proof to him to mitigate his punishment. The prosecutor's comments merely indicated that the jury

---

**20.** The prosecutor described the victim and the crime more fully in the following terms:

[L]adies and gentlemen, what you have to weigh is that the defendant ambushed a defenseless, elderly woman who was doing nothing more than working. She was working on a Saturday in the summertime. You have heard she worked part-time as many elderly people do work part-time, and her only crime that day was going to work and working all-day and talking to some people on the phone and talking to

people who came to the landfill and what she got for working that day was what the defendant gave her.

He shot her down. He shot her down for a car and for a few dollars and for some change. For no other reason. For a few dollars.

**21.** The opening summation covers six full pages of transcript in contrast to the rebuttal summation which covers less than four full pages of transcript.

was to weigh the aggravating circumstances against the mitigating circumstances.

### D.

■ DeShields also contends that the Trial Court erred in refusing to hold an evidentiary hearing on his claim of discriminatory application of the death penalty based on race. Following his conviction and before the penalty hearing, DeShields moved for a new trial and evidentiary hearing on the basis of a study published in the November 17, 1985 edition of the *Dallas Times Herald.* The study indicated that murderers of white victims stood an 11.1 percent chance of receiving the death penalty, while murderers of black victims received only a 4.5 percent chance of receiving the death penalty. Defendant requested an evidentiary hearing "to present further statistical evidence and the backgrounds behind the results."

The Trial Court denied the motion for a new trial and refused to hold an evidentiary hearing. The Court noted that proof of disproportionate impact in the sentencing system was insufficient to establish discriminatory intent in the absence of any other reasonable inference; and that *voir dire* in this case included questions designed to reveal racial bias. (See footnote 22 below.)

On appeal, DeShields again argues that his proffered statistical proof tends to establish that juries throughout the United States act on a racial basis in imposing the death sentence against blacks who have killed white victims.[22] We agree with the Trial Court that DeShields' proffer of a national survey and a corresponding state-by-state breakdown of those results is insufficient to create a fact issue warranting an evidentiary hearing. Such a statistical proffer must be "so strong that the results would permit no other inference but that they are the product of racially discriminatory intent or purpose." *Prejean v. Maggio,* 5th Cir., 765 F.2d 482, 486 (1985) (quoting *Smith v. Balkcom,* 5th Cir., 671 F.2d 858, 859 (1982), *modifying* 5th Cir., 660 F.2d 573 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 181, 74 L.Ed.2d 148 (1982)). DeShields' tender does not meet this standard.

The statistics offered showed no more than a rough correlation: that among all defendants sentenced to die in the United States, those whose victims were white made up a disproportionate number of condemned inmates.[23] This finding of an unexplainable disparity does not account for the racially neutral variables that are present in the sentencing of capital crimes. *See Prejean, supra* at 486; *Smith, supra* at 859. Furthermore, DeShields presented no statistical analysis of the Delaware capital sentencing system; nor did he specify what further evidence he would present at the hearing. *See, e.g., Baynard v. State,* Del.Supr., 518 A.2d 682, 694–95 (1986) (proper to refuse to hold evidentiary hearing absent new or different evidence).

**22.** DeShields does not argue that any specific juror in this case was racially biased against him. *Cf. Turner v. Murray,* 476 U.S. 1, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986). The Trial Court asked the following two questions during *voir dire* to reveal any racial bias:

The defendant, Kenneth Wesley DeShields, is black. Do you have any prejudice, however slight, against black people which would affect you in any way in deciding this case?

\* \* \* \* \* \*

In this case, the defendant, Kenneth Wesley DeShields, is a black man, and the victim is a white, elderly woman. Does the fact that the defendant is black and the victim was white in any way prevent you from rendering a fair and impartial verdict based solely on the evidence? Each juror seated on the panel answered both of the questions in the negative.

**23.** *See also McCleskey v. Kemp,* 11th Cir., 753 F.2d 877, 892 (1985), *aff'd,* 481 U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Henry v. Wainwright,* 5th Cir., 721 F.2d 990, 997–98 (1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Sullivan v. Wainwright,* 11th Cir., 721 F.2d 316, 317 (1983); *Adams v. Wainwright,* 11th Cir., 709 F.2d 1443, 1449–50 (1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203, *reh'g denied,* 465 U.S. 1074, 104 S.Ct. 1432, 79 L.Ed.2d 755 (1984).

Because we find DeShields' proffer to be too speculative and conclusory, we conclude that the Trial Court did not abuse its discretion in refusing to hold an evidentiary hearing. We also note that the Supreme Court has recently rejected DeShields' underlying substantive arguments in *McCleskey v. Kemp*, 481 U.S. ——, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

### E.

■ DeShields next contends that the imposition of a thirty year prison term for the violation of 11 *Del.C.* § 1447 [24] constitutes cruel and unusual punishment in violation of the Eighth Amendment.[25] In *Solem v. Helm*, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), the Supreme Court held that a criminal sentence must be proportionate to the crime for which the defendant has been convicted. Reviewing courts, however, should grant substantial deference to the broad authority that legislatures possess in determining the types and limits of punishments, as well as to the discretion that trial courts possess in sentencing convicted criminals. *Id.* at 290, 103 S.Ct. at 3009. In view of the substantial deference accorded legislatures and trial courts, an appellate court rarely will be required to engage in an extended analysis to determine that a sentence is not constitutionally disproportionate. *Id.* at 290 n. 16, 103 S.Ct. at 3009–10 n. 16.

In *Helm*, the Court identified three objective factors to be considered when reviewing a sentence under the Eighth Amendment. *Id.* at 290–92, 103 S.Ct. at 3010–11. They are: (1) the gravity of the offense and the harshness of the penalty; (2) the sentences imposed on other criminals in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *Id.* Applying these factors, we find that a thirty-year sentence under section 1447 is not cruel and unusual punishment.

*First,* possession of a deadly weapon during the commission of a felony is a serious offense that involves actual violence or the threat of violence. *Cf. Helm, supra* at 296, 103 S.Ct. at 3013. The purpose of the weapons statute "is to prevent a 'non-violent' felony from becoming a violent one." *Mack v. State*, Del.Supr., 312 A.2d 319, 321 (1973). The mere possession of a weapon, whether or not it is used to facilitate the crime, creates an additional danger to the victim and to society at large. *LeCompte v. State*, Del.Supr., 516 A.2d 898, 902 (1986). It is this additional danger which the Legislature has singled out for particular deterrence and enhanced punishment. *Id.*

*Second,* the Legislature has classified possession of a deadly weapon during the commission of a felony as a class B felony along with other crimes that involve the risk of, or the actual infliction of, physical injury to individuals. *See* 11 *Del.C.* §§ 613

---

24. 11 *Del.C.* § 1447, in pertinent part, provides:

§ 1447. **Possession of a deadly weapon during commission of a felony; class B felony.**

(a) A person who is in possession of a deadly weapon during the commission of a felony is guilty of possession of a deadly weapon during commission of a felony.

Possession of a deadly weapon during commission of a felony is a class B felony.

(b) Any *sentence imposed* for a violation of this section shall not be subject to suspension and no person convicted for a violation of this section shall be eligible for parole or probation during the period of the sentence imposed.

11 *Del.C.* § 4205(b)(2) provides:

§ 4205. **Sentence for felonies.**

(b) The term of imprisonment which the court may impose for a felony is fixed as follows:

\* \* \* \* \* \*

(2) For a class B felony, from 3 to 30 years and such fine or other conditions as the court may order.

25. DeShields' argument is limited to the Eighth Amendment because Article I, section 11 of the Delaware Constitution relates only to the mode of punishment and not the length of a sentence authorized by the Legislature. *State v. Ayers*, Del.Supr., 260 A.2d 162, 169 (1969).

(assault in the first degree); 632 (manslaughter); 783 (kidnapping in the second degree); 826 (burglary in the first degree); and 832 (robbery in the first degree). Also, the thirty year term of imprisonment under section 1447 is similar to the penalties authorized for drug offenses which often involve violent confrontation.[26] 16 *Del. C.* §§ 4751(a), (c); 4753A(a)(1)–(3).

*Third,* the legislatures in several other jurisdictions have authorized similar terms of imprisonment, beyond those normally applicable, in order to penalize the use of a firearm or other deadly weapon during the commission of a serious felony. *See, e.g.,* Ark.Stat.Ann. § 41–1004 (1985); Ariz.Rev. Stat.Ann. § 13–604(F) (1986); Idaho Code § 19–2520 (Supp.1986); Md.Ann.Code art. 27, § 36B(d) (Supp.1986); Neb.Rev.Stat. § 28–1205 (1985); S.D.Codified Laws Ann. § 22–14–12 (Supp.1986); Wyo.Stat. § 6–8–101(a)(1985). Therefore, we grant substantial deference to the Legislature's authority and hold that a thirty year sentence for possession of a deadly weapon during the commission of a felony is not disproportionate to the crime committed: in this case, murder in the first degree.

## VI

█ Finally, we turn to our statutory obligation to review the imposition of the death penalty in this case. *See Riley,* 496 A.2d at 1026; *Flamer v. State,* Del.Supr., 490 A.2d 104, 137–45, *cert. denied,* 464 U.S. 865, 104 S.Ct. 198, 78 L.Ed.2d 173 (1983). 11 *Del. C.* § 4209(g)(2) provides as follows:

The Supreme Court shall limit its review under this section to the recommendation on an imposition of the penalty of death and shall determine:

a. Whether, considering the totality of evidence in aggravation and mitiga-

tion which bears upon the particular circumstances or details of the offense and the character and propensities of the offender, the death penalty was either arbitrarily or capriciously imposed or recommended, or disproportionate to the penalty recommended or imposed in similar cases arising under this section.

b. Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection (3) of this section and, where applicable, § 636(a)(2)–(7) of this title.

Addressing subparagraph b first, we conclude that the evidence supported the jury's findings of the statutory aggravating circumstances enumerated under section 4209(e). The first aggravating circumstance was that DeShields had been previously convicted of a violent felony. 11 *Del. C.* § 4209(e)(1)i. During the penalty hearing, the prison records supervisor testified that DeShields had been convicted of first degree robbery, 11 *Del. C.* § 832. The police officer who investigated that crime also gave a general account of the crime, and the victim's son recounted how he found his mother after the incident. Viewing this evidence in the light most favorable to the State, a rational juror could conclude beyond a reasonable doubt that DeShields had been previously convicted of a violent felony. *Davis v. State,* Del.Supr., 453 A.2d 802 (1982).

The second aggravating circumstance was that the killing occurred during the commission of a robbery. 11 *Del. C.* § 4209(e)(2). Since the jury had already convicted DeShields of felony murder pursuant to 11 *Del. C.* § 636(a)(2), that conviction established the statutory aggravating circumstance. *See Deputy v. State,* Del. Supr., 500 A.2d 581, 602 (1985); *cert. denied,* —— U.S. ——, 107 S.Ct. 1589, 94

---

26. *See Traylor v. State,* Del.Supr., 458 A.2d 1170, 1178 (1983) ("organized traffic in illegal drugs is a serious problem ... fostering additional crimes").

L.Ed.2d 778 (1987). The third statutory aggravating circumstance, namely, that the victim was at least 62 years old, 11 *Del.C.* § 4209(e)(1)r, was undisputed. DeShields and the State both acknowledged that Reed was 67 years old at the time of her death.

Two additional inquiries are posed under subparagraph a of section 4209(g)(2). *First,* whether the jury's imposition of the death penalty was either arbitrary or capricious, and *second,* whether the death penalty imposed was disproportionate to the penalty imposed in similar cases arising under the statute. Each question requires a consideration of the totality of evidence in aggravation and mitigation which bears upon the particular circumstances or details of the offense and the character and propensities of the offender. 11 *Del.C.* § 4209(g)(2)a; *Riley, supra.*

The State's evidence with respect to the statutory aggravating circumstances established that DeShields had been previously convicted of a violent felony; that the murder was committed during the commission of a robbery; and that the victim was 67 years old. The non-statutory aggravating circumstances upon which the State relied were that: DeShields had a prior criminal record (robbery, theft, and escape); DeShields was on parole at the time of the offenses; and the victim was defenseless.

In mitigation, DeShields offered evidence to establish that (1) he was a model prisoner; (2) he was able to function well in the structured environment of a prison; (3) he would not be dangerous to society if subject to life imprisonment; (4) he had family and friends who love him and whom he loves in return; and (5) he had a troubled youth. After careful review of the entire record, we find that the sentence of death imposed by the jury was neither arbitrarily nor capriciously imposed.

We next address the remaining question as to whether the death penalty imposed was disproportionate to the penalty recommended or imposed in similar cases arising under our statute. We must compare DeShields' sentence with the penalties in all first degree murder cases which have gone to trial and a penalty hearing. *Riley, supra* at 1027. We have done so by reviewing the "universe" of cases established in *Flamer* and *Riley,* including more recent cases falling therein. Moreover, we have considered objective factors such as the gravity of the offense, the circumstances of the defendant's crime, and the harshness of the penalty. *See Solem v. Helm,* 463 U.S. 277, 290–92, 103 S.Ct. 3001, 3010, 77 L.Ed.2d 637 (1983).

A "definitive comparison of cases is almost impossible and necessarily touches upon the realm of speculation," *Flamer,* 490 A.2d at 144. However, we find that the death sentence imposed upon DeShields is not comparatively disproportionate to the other first degree murder cases that have arisen under our statute and under which a statutory aggravating circumstance was found by the jury. *See Deputy, supra* at 602. DeShields, like the other defendants sentenced to death, was found guilty of "an unprovoked, cold-blooded murder of a helpless person (or persons) committed upon victims lacking the ability to defend themselves and solely for pecuniary gain." *Riley, supra.* [27] Thus, this case fits into the pattern of the other cases in which the death penalty has been imposed; i.e., an execution-type slaying of a helpless victim in cold blood. Therefore, the convictions and sentences are hereby AFFIRMED.

## UPON MOTION FOR REARGUMENT

Defendant seeks reargument as to two evidentiary rulings of the Trial Court which we originally affirmed, both of which con-

---

**27.** As noted in *Riley,* the defendant in *Whalen v. State,* Del.Supr., 492 A.2d 552 (1985), was found guilty of committing murder during the commission of a violent rape rather than during the commission of a robbery as in the other death penalty cases.

cern the admission into evidence of the shell casing (the only evidence directly linking victim's death to defendant's shotgun) and victim's wallet. The Trial Court first ruled that both items of physical evidence would have been inevitably discovered by lawful police discovery techniques. Thus, the items would not be suppressed even though they were originally discovered after police officer Hudson continued his interrogation of defendant after *Miranda* required him to cease. *See supra* section II. Defendant seeks to reargue the adequacy of the evidence of record to sustain the Trial Court's ruling that the evidence would inevitably have been discovered.

We affirm our previous ruling and again conclude that the Trial Court's predicate finding for application of the inevitable discovery rule is adequately supported by the record and not clearly erroneous. *See Nix v. Williams,* 467 U.S. at 448, 104 S.Ct. at 2511. The finding we refer to is the Trial Court's finding that the police would have ultimately come upon the physical evidence in their search of the landfill area. *See supra* section II–B.

 The second issue raised by defendant's reargument motion concerns the Trial Court's rejection of defendant's motion to suppress defendant's remaining statement made to Detective Passwaters shortly after 5:00 p.m. on the day of defendant's arrest. *See supra* II–A. Defendant contests that ruling and this Court's conclusion that his subsequent admissible statement to Passwaters "would have ultimately led to the discovery of the same evidence." *Supra* II–B. That conclusion, of course, assumes the admissibility of the statement.

Defendant again argues that his 5:00 p.m. statement to Passwaters was inadmissible as a matter of law on either of two grounds: (a) because obtained so close in time to defendant's prior inadmissible statements as to be "tainted" under *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (not *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222

(1985), as defendant argues); or (b) because lacking in voluntariness due to police trickery or coercion.

In our original Opinion, we did not fully address defendant's contention that the Passwaters statement was inadmissible through taint or coercion. We simply agreed with the Trial Court's findings that defendant had "voluntarily reinitiated contact" with Passwaters shortly after 5:00 p.m. *Supra* II–A; and we concluded that defendant's "subsequent admissible statement to Passwaters would have ultimately led to the discovery of the same evidence." *Supra* II–B.

We now find that quoted phrase needs clarification. While the Trial Court ruled that the Passwaters statement of defendant would be admitted, the statement was not, in fact, offered by the State and was not admitted into evidence, as we correctly noted at II–A of our Opinion. That being the case, defendant's reargument attacking the legality (and admissibility) of the Passwaters statement represents a nonissue that is not a ground for reversible error.

Although the statement itself was never admitted into evidence, the fact remains that the Trial Court admitted the shell casing and victim's wallet; and it is only reasonable to infer that the admission of this evidence was grounded on dual findings: (1) that, as previously addressed, a later police search would have inevitably discovered the incriminating evidence; and (2) that the evidence would have been independently discovered through defendant's statement to Passwaters as to where victim's wallet would be (and was) found. Therefore, we think it both appropriate and necessary to more fully address defendant's arguments for ruling out any reliance upon the Passwaters statement as a basis for affirming the Trial Court's suppression ruling.

The essence of defendant's argument is that under *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985), defendant's 5:00 p.m. statement to Passwa-

ters was inadmissible because it was "tainted" by his three earlier statements, which the Trial Court ruled to be inadmissible under *Miranda.* Applying an *Elstad-type* analysis, defendant argues that his fourth statement was inextricably linked with his prior statements of the same day and taken within approximately one hour of his third statement to Detective Hudson, though given to a different police officer, Detective Passwaters.

Addressing the taint issue first, we find defendant's reliance upon *Oregon v. Elstad* to be misplaced, but *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), to state the controlling law.[28] In *Mosley,* the Supreme Court addressed the question of the scope or limits of the *Miranda* waiver and held that whenever a suspect later indicates that he wishes to reassert his right to remain silent, the questioning must immediately cease. 423 U.S. at 104, 96 S.Ct. at 326. The Court, applying *Miranda* principles, ruled that a suspect's "right to cut off questioning" must, under *Miranda,* be "scrupulously honored" by the police.

Applying the *Miranda* standard to a case involving a lawful interrogation interrupted by the assertion of a defendant's *Miranda* rights, the Court in *Mosley* focused on several factors: *one,* whether the police interrogator immediately ceased interrogation after being informed by the accused of his wish to reassert his right to remain silent; and, more to the point, *two,* whether the police later resumed questioning only after (a) the passage of a significant period of time; and (b) after the accused was afforded a "fresh set" of *Miranda* warnings. (Also deemed relevant was whether the second interrogation was restricted to a crime that had not been a subject of earlier interrogation, an inquiry not here pertinent.)

In *Dodson v. State,* Del.Supr., 513 A.2d 761, 763 (1986),[29] this Court, applying the *Mosley* rationale, held that "when a *Miranda* immunized defendant invokes his right to remain silent, the police may not initiate continued interrogation on the crimes at issue." If the police continue to question an accused after he exercises his right to remain silent, the reviewing court must determine if there is a "significant and unacceptable nexus" between the defendant's statement and the continued questioning. *Id.* at 764 (quoting *Tucker v. State,* Del.Supr., 411 A.2d 603 (1980)). If such a "nexus" exists between the defendant's statement and the resumed questioning, the statements of the defendant after he either exercised or reinstated his right to remain silent must be suppressed as

---

**28.** *Elstad* is inapposite because, there, the police failed to give the defendant his *Miranda* rights prior to his making an incriminating statement. Thereafter, the defendant was arrested and taken to the police station where, after being advised of and waiving his *Miranda* rights, he ultimately executed a written confession. 470 U.S. at 298, 105 S.Ct. at 1287. Here, in contrast, DeShields was read his *Miranda* rights by the police and waived them prior to questioning. However, after the Trial Court found defendant to have, in effect, reasserted his right to remain silent in the course of his interrogation, the Trial Court then ruled that his *Miranda* rights were violated when the police failed to cease immediately its interrogation. This fact pattern distinguishes this case from *Elstad,* as *Elstad* itself recognized in stating that, "inapposite [to the *Elstad* fact pattern] are the cases the dissent cites concerning suspects whose invocation of their rights to remain silent and to have counsel present were flatly ignored while police subjected them to continued interrogation." 470 U.S. at 313 n. 3, 105 S.Ct. at 1296 n. 3.

**29.** In *Dodson,* during an initial interrogation, the defendant said he would make a statement but not at that time, thereby invoking *Miranda.* The police then began questioning the defendant about another homicide, but after approximately 45 minutes, the police redirected the interrogation to the crimes for which the defendant was charged. This Court held that since the defendant had declined to make a statement concerning the murder for which he was charged, the police should not have redirected the questioning to the crime which was the subject of the terminated interrogation in the same conversation, only 45 minutes later, and without giving any "fresh" *Miranda* warnings. 513 A.2d at 764.

violations of the Fifth Amendment. Applying these principles in the instant case, the Trial Court properly suppressed defendant's three prior statements to the police made after his withdrawal of his *Miranda* waiver.

However, *Mosley* does not address the pivotal issue here presented: specifically, at what point and under what circumstances may police resume questioning of the accused regarding the crime that had been the subject of his earlier interrogations following assertion of his *Miranda* right to remain silent. In *Mosley,* Justice White recognized the problem when, in concurrence with the majority, he stated that:

> [t]he majority seems to say that a statement obtained within some unspecified time after an assertion by an individual of his "right to silence" is always inadmissible, even if it was the result of an informed and voluntary decision.... I disagree.... I suspect that in the final analysis the majority will adopt voluntariness as the standard by which to judge the waiver of the right to silence by a properly informed defendant. I think the Court should say so now.

*Mosley,* 423 U.S. at 107–08, 96 S.Ct. at 328 (White, J., concurring).

Using rationale similar to Justice White's, this Court in *Dodson* addressed this issue by relying upon *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in a Sixth Amendment right to counsel context. There, this Court stated that once a defendant has exercised his right to deal with the police only through counsel, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further

communication, exchanges, or conversation with the police." *Dodson,* 513 A.2d at 763 (quoting *Edwards,* 451 U.S. at 484–85, 101 S.Ct. at 1884–85).[30]

To relate this dual inquiry of initiation and waiver to defendant's fourth statement requires determining whether defendant initiated the interview and whether, under the circumstances, it was the result of an "informed and voluntary decision" of defendant. *See Mosley,* 423 U.S. at 107–08, 96 S.Ct. at 328 (White, J., concurring). Here, as we previously found, defendant "contacted Detective Passwaters and stated that he wanted to go into further detail about his earlier statement." *Supra* section II–A. We quote from the record the outset of Detective Passwaters' taped interview of defendant:

> I am Det. Passwaters of the Delaware State Police. Today's date 8/13/84, Time is 1714 hours. Again talking with Kenny DeShields. Is presently in cell at Troop # 4 and contacted me and requested to go in depth further with his statement from earlier. States that he wasn't telling me the truth at that point.
>
> I am going to advise you again that you have the right to remain silent that anything you say can and will be used against you in Court. That you have the right to an attorney, have him present while you are being questioned. If you cannot afford to hire one, one will be appointed to represent you before any questioning. If anytime during the questioning you desire to stop talking, you may do so.
>
> Q. Do you understand each of these rights as I have explained them to you?
>
> A. Yes I do.

---

30. In a subsequent decision, the Supreme Court outlined the analysis required by the *Edwards* rule. In *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the Court held that

> [f]irst, courts must determine whether the accused *actually* invoked his right to counsel.... Second, if the accused invoked his

right to counsel, courts may admit his responses to further questioning only on finding that he (a) *initiated* further discussions with the police, and (b) knowingly and intelligently *waived* the right he had invoked.

*Id.* 469 U.S. at 95, 105 S.Ct. at 493 (citations omitted) (emphasis added).

Q. With these rights in mind, do you wish to talk to me again?

A. Yes.

Q. Go ahead.

A. Saturday morning I did not get up until 10 o'clock Saturday morning....

Applying an *Edwards*-type analysis to this record, we conclude that defendant initiated the fourth statement to Detective Passwaters and this statement was properly ruled *admissible* by the Trial Court as an informed and voluntary decision of defendant to permit resumption of his interrogation; that the proximity in time of his previous statement did not taint the subsequent statement; and that defendant's Fifth Amendment rights were properly applied.[31]

We turn to defendant's second ground for finding his statement to Passwaters lacking in voluntariness. Defendant asserts that this statement was coerced and illegally induced by the police through trickery. The coercive techniques allegedly utilized by the interrogating officers included: pointing out to defendant that victim was white and highly influential in politics and defendant was black; lying to defendant; threats of charging defendant's girlfriend with the crimes charged to defendant; and telling defendant he would be better off if he cooperated and that he was in a situation "where he could determine if he lived or died."

This Court has addressed on several occasions the subject of when promises, lies, trickery or coercion will render a statement involuntary. *See, e.g., Baynard v. State*, Del.Supr., 518 A.2d 682, 690 (1986); *Lovett v. State*, Del.Supr., 516 A.2d 455 (1986); *Anderson v. State*, Del.Supr., 452 A.2d 955, 956–57 (1982); *State v. Rooks*, Del. Supr., 401 A.2d 943, 948–50 (1979). In *Baynard*, this Court expressly described the test for voluntariness when it stated:

The question of voluntariness is a question of fact to be determined from the effect that the totality of the circumstances had upon the will of the defendant. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973).... A totality of the circumstances approach, however, requires the reviewing court to consider the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the defendant. *Rachlin v. United States*, 8th Cir., 723 F.2d 1373, 1377 (1983). Factors which bear on these circumstances include the following:

> the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment such as the deprivation of food or sleep.

*Schneckloth*, 412 U.S. at 226, 93 S.Ct. at 2047 (citations omitted). *See also Rooks*, 401 A.2d at 948.

518 A.2d at 690.

In this case, Superior Court found defendant's 5:00 p.m. statement to Detective Passwaters was "the product of the defendant's rationale and intelligent free will and that at the time the defendant's will was not overborne." From our careful review of the record, we conclude that there is substantial evidence to support the Court's findings that defendant's statement was (1) defendant initiated; (2) informed; and (3) voluntary.

Defendant was a twenty-four-year-old male at the time of arrest with at least a tenth grade education. Defendant had considerable experience within the criminal justice system, with a criminal history dating back to 1973 and with long periods of

---

**31.** The Trial Court expressly found there to be "no causal connection" between defendant's statement to Passwaters and "the earlier interrogation method of which the defendant complained." The Court also expressly found that defendant had "initiated further discussions with the police and he knowingly and intelligently waived his Miranda rights [in making his statement to Passwaters] which the defendant initiated about 5:14 p.m. in a holding cell."

incarceration in juvenile and adult institutions. Thus, defendant was well aware of the consequences of making a confessional statement. *See Miller v. Fenton,* 3d Cir., 796 F.2d 598 (1986). Further, the record does not reveal that defendant was suffering from any physical ailment that would have impelled him to confess nor that he was under the influence of any drugs. *See Leyra v. Denno,* 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954). Given the Trial Court's finding of no causal connection between the earlier and the later police interrogating techniques, we affirm the Court's finding that defendant's final statement was not induced by promises or threats of bodily injury or physical coercion or, indeed, coercion of any actionable kind. *See, e.g., Baynard v. State,* 518 A.2d at 691; *Lovett v. State,* 516 A.2d at 464.

The evidence of record clearly fails to sustain defendant's contention that his statement to Detective Passwaters was involuntary due to police trickery or coercion sufficient to overcome defendant's will. Hence, the shell casing from defendant's shotgun and victim's pocketbook would have been discovered and admitted as a result of defendant's 5:00 p.m. statement, even if not discoverable from defendant's earlier partially admissible statement to the interrogating officers or even if such physical evidence would not have otherwise been discovered by routine police search practices in shotgun homicides.

\* \* \* \* \* \*

The Motion for Reargument is Denied.

### EXHIBIT A

In the Superior Court of the State of Delaware in and for Sussex County

### THE STATE OF DELAWARE

vs.

### KENNETH WESLEY DESHIELDS

NOS. S84–08–0075, 1075, 1275, 2075 & 2275

### REQUEST FOR DISCOVERY

NOW COMES THE DEFENDANT, Kenneth Wesley DeShields, by and through counsel, William B. Wilgus, Esquire, and Edward C. Gill, Esquire, request of the State pursuant to Superior Court Rule 16(a) and (b) the following items, materials and information:

(1) Written or recorded statements or confessions made by the defendant, or copies thereof, and the substance of any oral statement which the State intends to offer in evidence at the trial on the abovenumbered Counts;

(2) Written reports of autopsies, ballistics tests, fingerprint analyses, handwriting analyses, blood, urine and breath tests, and written reports of physical examination of the defendant or the alleged victim by a physician, dentist or psychologist made in connection with the case, or copies thereof.

(3) A listing of and the opportunity to inspect any and all books, papers, documents, photographs, maps and any other physical evidence which was seized from the defendant or which the State intends to use against the defendant at trial;

(4) Copies of all applications for, returns from, and affidavits in support of all search warrants, (whether executed or unexecuted) obtained in investigation of this case by the State or its agents;

(5) A statement as to whether any evidence or testimony has been produced or compelled pursuant to Attorney General subpoena under 29 Del.C. 2508(a) or threat thereof;

(6) Copies of all arrest warrants in this matter, including supporting affidavits, and disclosure of the date, time place and arresting officer with respect to any warrantless arrest;

(7) The date, time and place of the offenses;

(8) Disclosure of all exculpatory information, evidence or witnesses known to the State or any state agent, including any information which relates to motions to

suppress evidence or dismissal of the indictment;

(9) Disclosure of all agreements, between any agent of the State and any witness, including whether the individual has been or will be promised immunity from prosecution, or any other consideration in return for testimony;

(10) Disclosure, per *Boyer v. State*, Del. Supr. 436 A.2d 1118, 1126 (1981), of any criminal record of prosecution witnesses accessible to the State;

(11) An opportunity to review reports and statements, whether oral, written or recorded, made by persons who will testify at trial, regardless of whether the individual used the statement or report to prepare for examination.

/s/WILLIAM B. WILGUS, ES-QUIRE
/s/EDWARD C. GILL, ESQUIRE

DATED: August 2, 1985

EXHIBIT B

In the Superior Court of the State of Delaware in and for Sussex County

THE STATE OF DELAWARE

vs.

KENNETH WESLEY DESHIELDS

NOS. S84-08-0075, 1075, 1275
2075 & 2275

RESPONSE TO DISCOVERY REQUEST

NOW COMES, the State of Delaware, by and through its Chief Deputy Attorney General, Bartholomew J. Dalton and its Deputy Attorney General, James W. Adkins, and responds to the defendant's Request for Discovery as follows:

1. Enclosed please find copies of two transcribed statements made by the defendant. One statement consists of 36 pages and another statement consists of 5 pages. The tapes will be made available for you to copy at a mutually convenient time. The State also has in its possession 43 handwritten letters from the defendant to Sadie Sample covering a portion of the time period since his incarceration. These letters will be made available for you to copy at a mutually convenient time.

2. Enclosed please find copies of the following:

a) SBI fingerprint analysis dated October 16, 1984.

b) Letter to FBI from Delaware State Police dated October 30, 1984, requesting laboratory examination of certain items of physical evidence.

c) FBI report dated February 27, 1985, containing analyses of certain items of physical evidence.

d) FBI fingerprint analysis dated February 15, 1985.

e) SBI fingerprint analysis dated April 12, 1985.

f) SBI fingerprint report dated September 5, 1984.

g) Service Report prepared by Det. Swain, dated September 4, 1984.

h) Service Report prepared by Det. Bryson, dated August 14, 1984.

i) Supplement Report prepared by Det. Swain, dated October 1, 1984.

j) Supplement Report prepared by Det. Swain, dated October 24, 1984.

k) Autopsy report prepared by Judith Tobin, M.D.

l) Certificate of death prepared by Judith Tobin, M.D.

m) Toxicology report prepared by Medical Examiner dated August 28, 1984.

n) Report of Family Court counselor, Robert B. Wall, Jr., dated August 13, 1976.

3. Enclosed please find copies of two crime scene sketches made by the Delaware State Police. A large crime scene diagram which the State intends to use at trial is in Mr. Dalton's possession and may be viewed at a mutually convenient time. The physical evidence is located at Delaware State Police, Troop # 4, and may be viewed at a mutually convenient time to be scheduled by appointment. All photographs are located at the Department of Justice office in Georgetown and may be viewed by appointment.

4. Enclosed please find a copy of a consent search form signed by Odetta Boyd. There are no other search warrants.

5. No evidence or testimony has been produced or compelled pursuant to Attorney General subpoena.

6. Enclosed please find copy of arrest warrant and supporting affidavit for one count of Murder in the First Degree. The remaining charges result from Rule 9 Warrants which are of public record.

7. August 11, 1984, at approximately 4:00 to 4:30 P.M. The location was at the landfill site near Lincoln, Sussex County, Delaware.

8. State recognizes its duty under *Brady* and, in view of the defendant's general request, we shall review our file and report any exculpatory evidence to the defendant in a supplement to this Response to Discovery within two weeks.

9. Immunity from prosecution has not been offered in this case. Enclosed please find copies of receipts showing that Franklin Cephas and Lee Ross were paid $50.00 and $40.00 respectively for, and in consideration of, information supplied in this investigation.

10. At this point, the State refuses to offer criminal records of any witnesses in the case. This request seems to be a *Brady* type request and the State opposes any pretrial disclosure of same.

11. The State recognizes its duty under *Jenks* but, at this time, objects to pretrial disclosures of same.

/s/James W. Adkins
Deputy Attorney General

DATED: August 8, 1985